# CHARLESTON

## CONRAD *v.* BALTIMORE & OHIO RAILROAD CO.

### Submitted March 17, 1908.    Decided March 24, 1908.

1. NEGLIGENCE.—*Unguarded Premises—Injuries to Infants.*

   The law imposes no liability upon a railroad company for maintaining, upon its private property, an unlocked, unfastened and unguarded turntable, in favor of children, though located in a thickly settled community, near a public street and on ground on which children are wont to congregate for play. (p. 176.)

Error to Circuit Court, Cabell County.

Action by Homer Shella Conrad against the Baltimore & Ohio Railroad Company. Judgment for plaintiff, and defendant brings error.

*Reversed.*

VINSON & THOMPSON, for plaintiff in error.

ISBELL & PERRY, for defendant in error.

POFFENBARGER, PRESIDENT:

The Baltimore & Ohio Railroad Company complains of a judgment for $500.00, rendered against it and in favor of Homer Shella Conrad, an infant, on a demurrer to evidence by the circuit court of Cabell county, in an action for injuries sustained by the plaintiff while playing on an unlocked,

unfastened and unguarded turntable, owned and operated by the defendant, and located in a thickly settled portion of Central City, a place of about three thousand inhabitants, about 150 feet from one of the principal cross streets, and near grounds on which children were wont to congregate and play. The turntable is on a spur track of the railway built by the Huntington and Big Sandy Railroad Company, and afterwards operated by the Ohio River Railroad Company and now by the Baltimore and Ohio Railroad Company as lessee or owner, but the table had not been in use for sometime before the accident happened. Plaintiff and other boys had frequently assisted the railway employees in turning engines on it by invitation. They had also played "Hide and Seek" and "Throw the Wicket" around it, and it was not unusual for some of them to start the turntable and ride on it. In this latter form of amusement, the plaintiff had not engaged until the day on which he was hurt. Then he was down in the pit pushing the machine around, and, just before one end of it came to the fixed track rails, he jumped up on it, but, failing to get back far enough to avoid injury, his leg was caught and severely hurt both above and below the knee, the flesh being bruised, torn and lacerated in both places and a bone broken above the knee. He was a bright, intelligent little fellow about twelve years old, had worked in a glass factory for a considerable period of time before he was hurt, knew the danger incident to the operation of the turntable and would not have been hurt, had not another boy been so near the end of the machine that he could not get back out of danger.

The doctrine of what are known as "The Turntable Cases," first declared in *Railroad Co.* v. *Stout*, 17 Wall. 657, and re-affirmed in *Railroad Co.* v. *McDonald*, 152 U. S. 262, has not been generally accepted by the state courts, nor is the authority of those cases more than merely persuasive here. On the contrary, it has been most emphatically repudiated in Massachusetts, New York, New Hampshire, New Jersey, Texas, Pennsylvania, Ohio and Virginia. Moreover, this Court has, in two cases, declared against it unequivocally, though a turntable accident was not involved in either of them. *Ritz* v. *Wheeling*, 45 W. Va. 262; *Uthermohlen* v. *Boggs Run Co.*, 50 W. Va. 457. It is true JUDGE BRANNON,

in delivering the opinion of the Court in the latter case, said "A turntable in a town is in a much frequented place, and though private property, the place is much used as a highway and the company may be held to know that children do and will come upon its premises," and then demonstrated the utter absence of any public character or right in the premises in question; but this affords no ground for an inference of approval, by him or the court, of the principle relied upon here. In the preceding paragraphs of the opinion he had vigorously condemned it. In the observation quoted, he was simply indicating inapplicability of the principle to the facts, if the court could yield assent to it as a sound principle of law. Though the declarations of this Court may be regarded as *dicta*, turntables not having been involved, that is immaterial since we approve the reasoning upon which the conclusions are based. Like other decisions, not binding as precedents, they are merely persuasive, as authority, but we see no ground upon which turntables can be distinguished from other lawful machines, fixtures or structures on an owner's premises, calculated to excite the curiosity, or induce the presence, of children. There is an utter lack of intention to do any person wrong in the construction, maintenance and operation thereof, and the right to perform these acts is incident to the ownership of the land whereon they are done. They are within the dominion and power the law allows an owner to exercise over his own property. Unfastened and unguarded turntables are sometimes called "attractive nuisances," but there is, in our opinion, no principle of the law of nuisance under which the appellation can be justified. A turntable is a useful and lawful machine, affixed to the owner's real estate, and incapable of doing any manner of harm to any person off of the land. It is immobile, not unsightly, not obstructive, not offensive in any sense. Nobody can be injured by it unless he come upon the land and set the machine in motion himself to his own injury. How can this be logically within the maxim *Sic utere tuo ut alieum non laedas*, so use your own as not to injure another's property? Or the other one, *Prohibetur quis faciat in suo quod nocere possit alieno*, it is prohibited to do on one's own property that which may injure another's? It is utterly impossible for the structure to injure the adjoining property.

Individuals may get hurt by it when on the property on which it is located, but in no other way. Nobody but the owner, his servants and licensees can ever be rightly on or about it. As long as all others stay away from it, the working of injury to them or their property by it is an impossibility. Under some circumstances, an owner of property is liable to injury done to tresspassers on his property, but, in such cases, the injury is intentional, willful and wanton. There is purpose and design to do injury, as in the setting of spring-guns for thieves or robbers, by which a neighbor, having no knowledge of it, is hurt, while merely trespassing on the property in pursuing his own fowl, and the baiting of traps with decayed meat with intent to attract a neighbor's dogs to their death in the traps. It seems to us that, in these cases, the malicious intention constitutes the basis of the liability for damages. The distinction I make was recognized by Lord Ellenborough in the case in which the doctrine of liability for such acts was first promulgated. In part, he said: "Every man must be taken to contemplate the probable consequences of the act he does. And therefore when the defendant caused traps scented with the strongest meats to be placed so near to the plaintiff's house as to influence the instinct of those animals, and draw them irresistably to their destruction, he must be considered as contemplating this consequence of his act. That which might be taken as general evidence of malice against all dogs, coming accidentally within the sphere of the attraction which he had placed there, must surely be evidence of it against those in particular which were placed nearest to the source of attraction, and within the constant influence of it. What difference is there in reason between drawing the animal into the trap by means of his instinct which he cannot resist, and putting him there by manual force? If a man knowingly keep a dog accustomed to bite, an action lies against the owner, though he had no malice against the particular individual. Here there is evidence that the defendant's purpose in setting the trap was to catch dogs in general, as well as vermin; for he afterwards recompensed his servant for dogs taken in the traps." *Townsend* v. *Wathem*, 9 East 281. Mark the use of the words "malice" and "purpose." They are indicative of the legal principle under which liability

was imposed. The turntable doctrine is founded partially on *Lynch* v. *Nurdin*, 1 Q. B. 29. In that case, the defendant had left his horse and cart standing in a public street in which children were playing, one of whom climbed upon the cart and, while another was leading or driving the horse, fell from a shaft and was injured by one of the wheels. Here the act causing the injury was done, not on the land of the actor, but in a public street. The cart and the child were both rightfully on the ground on which the accident occurred. The gist of the decision is negligence in leaving an unattended horse and cart in a public street on which children had a right to be and which there was reason to believe they frequented. The *locus in quo* was one in which the parties had equal right. We do not perceive the supposed analogy between such a case and one in which a man erects or leaves a structure, machine or other thing on his own lands upon which strangers cannot rightfully come. That liability was predicated on the doing of a negligent act in a public highway, not on the premises of the defendant, is clearly shown by Lord Denman's opinion. After discussing the spring-gun cases, he said: "A distinction may be taken between the wilful act done by the defendant in those cases, in deliberately planting a dangerous weapon in his ground with the design of deterring trespassers, and the mere negligence of the defendant's servant in leaving his cart in the open street. But between wilful mischief and gross negligence the boundary line is hard to trace: I should rather say impossible. The law runs them into each other, considering such a degree of negligence as some proof of malice." Neither *Lynch* v. *Nurdin* nor any other English case I have found applies this principle to lawful and unmalicious acts done by a man on his own premises. Nor, in most of the states in which the turntable cases are regarded as law is the principle applied to persons other than railroad companies, nor to them in respect to structures or machines other than turntables. What possible ground is there for such distinction and discrimination?

The high character of the United States Supreme Court in which *Railroad Co.* v. *Stout* was decided constrained many of the state courts to accept its decision as being well founded in legal principle, and, for some years, the doctrine

seemed likely to be approved throughout the country; but the tide is setting strongly in the opposite direction. It has been disapproved in the following recent cases: *Railroad Co. v. Harvey*, 83 N. E. 66, Dec. 3, 1907; *Pannill v. Railroad Co.*, (Va.), 53 S. E. 113, 4 L. R. A. N. S. 80, March 22, 1906; *Thompson v. B. & O. R. R. Co.*, (Pa.), 67 Atl. Rep. 768, June 4, 1907; *Ryan v. Tower*, 128 Mich. 463, Oct. 22, 1901, not a turntable, but expressly disapproving the doctrine. *Dobbins v. Railroad Co.*, 91 Tex. 60, May 24, 1897; *Railroad Co. v. Beavers*, 113 Ga. 398, Dec. 21, 1901.

We are not unmindful of the peculiarities and frailties of children, nor insensible of the imperious duty, founded upon considerations of humanity and public policy, to throw around them every just and wholesome safe-guard, and it would be highly repugnant to our sympathies and natural impulses to withold from a crippled child any possible right the law gives him; but it is not the province of courts to make laws, or give rights not conferred by law, and we could not do so in this instance without enunciating a principle which, carried to its logical results, would impose an extensive and burdensome restraint upon the dominion of owners over their own property.

For the reasons stated, the judgment will be reversed, and judgment rendered for the defendant, with costs in this Court and the court below.

*Reversed.*