# CHARLESTON.

H. S. Adams, *Admr., etc. v.* Virginian Gasoline & Oil Company

(No. 6771)

Submitted October 21, 1930.   Decided November 18, 1930.

*Harold A. Ritz* and *B. J. Pettigrew,* for plaintiff in error.
*Harper & Baker* and *S. P. Bell,* for defendant in error.

Maxwell, Judge:

This writ of error lies to a judgment of the circuit court of Roane County for $10,000.00 based on a verdict in like amount in favor of the administrator of the estate of James Philip Adams, deceased, against Virginian Gasoline & Oil Company,

a corporation, for the death of said decedent as a result of alleged negligence on the part of defendant.

The deceased, a child of seven years and five months, met his death the 13th day of September, 1929, in a railroad live stock pen at Spencer. The pen in which the accident occurred had been erected in 1926 by the Roane County Cooperative Live Stock Shippers Association under a license or permit granted it by said railroad company. An adjoining pen and this pen, designated in the record as Nos. 1 and 2, respectively, were erected in part overlying a two and one-half inch pipe buried at a depth of two and one-half or three feet underground which had been placed there in 1924 by the Ohio Fuel Oil Company under license or permit of the said railroad company for the purpose of transporting gasoline from storage tanks some distance from the railroad company's property to gasoline loading racks at one of the sidetracks of said railroad company. The defendant is successor to the Ohio Fuel Oil Company, with respect to this property. About the middle of the day of the fatal accident, one of the employees of defendant observed that gasoline was coming up through the ground at the stock pens along the route of the gasoline line. Immediately after the noon hour the cattle which were in pen No. 2 were removed therefrom, and three employees of the defendant set to work to find the gasoline leak and to repair the same. The work of digging and shoveling dirt from along the route of the pipe line in an effort to find the point at which the gasoline was leaking continued throughout the afternoon. The men made excavations outside of the pens and in both No. 1 and No. 2 pens. They stopped work for the day at about five fifteen in the afternoon. Leaking gasoline had accumulated in the excavations and a few gallons thereof had been salvaged by employees of the company. There were a few gallons in the bottoms of the excavations when the men stopped work for the day.

There were many people about the cattle pens that day, that being a day on which cattle were brought in from neighboring farms for the purpose of shipment that night or the next morning, and among the persons who were there present were not only those who had business there, but there were others, both

·men and boys, who were there merely because of their interest or curosity in what was transpiring. The work of the defendant's employees in searching for the gasoline leak attracted attention. Onlookers viewed the work from the outside of the pens and from their seats on top of the heavy plank fence which surrounded the pens. Among those who were curious observers were Remus Tanner, a boy of sixteen years, and the decedent. Just before defendant's employees ceased work for the day, the Tanner boy assisted in wiring the gate to pen No. 2 in order to prevent cattle from getting in from the run-way or alley which extends along the side of the pens. This boy says that Hicks, one of the men working in search of the gasoline leak, told him that he could have some of the gasoline in the excavations for his assistance in wiring the gate, but Hicks denies this. Hicks also testifies that the little boy, the decedent, asked him if he could have some of the gasoline and that he told him that he could not, and further that he told the boy not to go about that place. Remus Tanner testifies that Hicks further told the deceased that he (Hicks) had given the gasoline to Tanner; likewise denied by Hicks. When Hicks and his two fellow workmen left the pen, the Tanner boy and the deceased remained there. The exact location of the Tanner boy at that time does not appear from the evidence, but the deceased was just outside of the pens. Shortly after the three employees left, Tanner started in search of a vessel in which to gather up some of the gasoline. The little boy went along; whether he went agreeably to the older boy or whether he just "tagged after him" does not appear. They went several places, making inquiries for a vessel and finally found one, and, accompanied by Willie Miller, a boy of twelve who joined them en route, returned to the cattle pens. Tanner testifies that he and Miller tried to run away from the small boy. The two older boys proceeded to dip up gasoline, while the small boy looked on. They procured about five gallons of the liquid, and started with it in search of a purchaser. They left the deceased just outside of the pen, although Miller says the deceased was attempting to crawl into the second pen as they left. He remarked to them that he had some tar on his hands and that he wanted to wash it off with gasoline. Tanner

says they gave him some gasoline in which to wash his hands, but that he just washed off a little of the tar. That was the last time any witness saw him alive. He was found a little later in the evening lying on his back in the bottom of the excavation in pen No. 2. Efforts to resuscitate him were of no avail. He was dead,—asphyxiated by gasoline fumes. Whether he was overcome by the fumes while standing at the edge of the excavation and fell in, or whether he climbed or fell in and was then overcome, does not appear in evidence; probably nobody knows.

The defendant assigns numerous errors, all of which cluster around and are incident to defendant's major proposition that the deceased, at the time of the injury which caused his death, was a trespasser; that the defendant therefore owed him no duty other than not to injure him wilfully or wantonly, and that there is no evidence of either wilful or wanton injury. The record would not warrant a finding that the deceased was either an invitee or a licensee of the defendant at the time and place of the accident. He was a trespasser as to the defendant, though probably a licensee as to the Live Stock Association. But the rule of law which requires only that a proprietor shall not wilfully or wantonly injure a trespasser upon property owned by him or under his control does not stand naked and unqualified in all its stoic severity. Where there is known trespassing upon property, or where such trespassing should in all reason have been anticipated, the proprietor cannot be entirely indifferent thereto by permitting to exist thereon a dangerous instrumentality which may easily be destructive of life or limb of persons participating in such trespassing. This is particularly true where children are involved. Thus we stated in *Colebank* v. *Nellie Coal & Coke Co.*, 106 W. Va. 402: "An owner of land owes some duty even to trespassers. He cannot wantonly injure them, and, in addition, if his property is being used with his knowledge by other people he may not without liability permit to exist thereon in a negligent and careless manner a dangerous factor which may destroy the life or limb of those to whose use of his property he tacitly consents, or, at least, does not object." In that case a child was injured by powder which it obtained

from an open can in an unfastened small building where the powder had been stored by the defendant on its property in the immediate vicinity of portions of its property which were known by officers and agents of the company to be habitually used by children as playgrounds. We held that the question of negligence was one for jury determination. We find a concise statement of the playground rule in 45 Corpus Juris, p. 807: ''Where children of tender years are in the habit of using premises as a playground and the owner knows of such use and acquiesces therein for such time as to give to children playing thereon the status of licensees, he owes to such children a duty to protect them against dangers of whose existence he knows.'' In *Wellman* v. *Fordson Coal Co.*, 105 W. Va. 463, where a child was killed by powder he had picked up on defendant's property where he and his associates were accustomed to play, JUDGE HATCHER very properly stated that whether the children were ''invitees or trespassers, the defendant company through its servants owed to them a high degree of care while permitting them access to the powder.'' In accord with the *Colebank* and *Wellman* cases: *Romana* v. *Boston Elevated Ry. Co.*, (Mass.) 116 N. E. 218; *Miller* v. *Chandler*, (Ky.) 182 S. W. 833. *A fortiori* does this principle apply where there is the known presence of a young child, though a trespasser, at the time and place of great danger.

While the record discloses that children were frequently in and about the stock pens at Spencer and often assisted in the handling of small stock, with at least the tacit approval of representatives of the Live Stock Association, it does not appear that the fact of their frequenting that place had been brought to the attention of employees of the defendant; but, as already noted, employees of the defendant had notice on the day of the accident of the presence of children as well as adults at the cattle pens. They knew that the work in which they were engaged had attracted the attention of numerous people, both adults and boys. The fact that employee Hicks told the deceased that he could not have any gasoline and ''not to go about that place,'' does not control the case for the defendant. That admonition was given when the boy, sitting on the fence of the pen and very near to where the work was being done,

asked if he might get some of the gosoline. His interest in the dangerous instrumentality became manifest at that moment to the men there at work. An admonition to an active and interested small boy assumes a much less significant status than a like admonition to an older child or an adult. Grown people in charge of highly dangerous instrumentalities cannot, with legal propriety or immunity, be disregardful of the known characteristics of early childhood. The boy remained just outside the pen when the men quit work and left for the day. The men could not well avoid being conscious of his presence when they departed. Could they safely close their eyes to the natural impulses of childhood under such circumstances and leave exposed and unguarded a highly dangerous agency in the immediate presence of a child of immature judgment but with a known awakened interest in the dangerous instrumentality? They fastened the gate admittedly for the purpose of keeping cattle away from the excavation. A fence of parallel planks with spaces between them, such as the one here involved, is more of an invitation than a barrier to an active, normal boy of seven. The gasoline in the excavation was dangerous not only to the boy who was killed by it, but to anyone who might have gone about it. True, an accident might not have happened to anyone else going there, and, in fact, none did happen to the men who were making the excavation or the men who recovered the dead body of the boy, but the danger was there nevertheless,—danger of deleterious vapors, and danger of fire. Gasoline has come into such very general use that all men must take note of its dual dangerous character. W. H. Kelly, superintendent of defendant's oil department, Spencer district, testified that he had known two men to be overcome by gasoline fumes. Dr. A. T. Gordon, testifying relative to the effects of gasoline fumes upon the human system, stated that the fumes combine with the red corpuscles of the blood and in that way destroy the oxygen-bearing power of the red corpuscles; that the gas occupies the oxygen-bearing cells, and it does not make any difference how much air you have the oxygen can't get in. The volatile and dangerous nature of gasoline is recognized by the courts. *Shaffer Oil Co.* v. *Thomas*, (Okla.) 252 Pac. 41; *Gibson Oil Co.*

v. *Sherry*, (Ark.) 291 S. W. 66, wherein it was said: "Gasoline becomes volatile when exposed to the air and is easily ignited when it comes in contact with a flame. Therefore, gasoline is, also, a highly dangerous substance, and the same rule applies to it as above stated with regard to gas." To the same effect are *Sedita* v. *Steinberg*, (Conn.) 134 Atl., 243, and *Hunt* v. *Rundle*, 120 So., 696. But it is very doubtful if such dangers can be comprehended by a child of seven.

So that while here we do not have evidence that representatives of the defendant knew of a habit of children to frequent the place where the accident occurred, we have a situation where a small child was present, and, to the knowledge of one or more of the defendant's employees, was much interested in the dangerous instrumentality with which they were dealing. In such situation, it was for the jury to say whether there was negligence on the part of the defendant in leaving the excavations exposed and unguarded, and, if so, whether such negligence was the proximate cause of the fatal injury to the deceased.

Ordinarily, children are not exempt from the general rule that a proprietor owes no duty to trespassers except not wantonly or wilfully to injure them. *Simmons* v. *C. & O. R. R. Co.*, 97 W. Va. 104; *Diotiollavi* v. *Coal Co.*, 95 W. Va. 692, 697, but this rule does not apply where there is an exposed and unguarded danger, known to the proprietor, and where it is also known to the proprietor (a) that children are in the habit of resorting for play to his property, at the place of danger, or in its immediate vicinity, or (b) that children are actually present at the time and place of danger. In such situations, the proprietor must exercise reasonable care to avoid injuring the children, and whether such care has been shown is generally a question of fact for jury determination. In fact, the duty of exercising reasonable care to avoid injury to a known trespasser is not confined to children. It is general. "Where a trespasser is actually discovered in a position or situation of peril, there is a duty to exercise ordinary care to avoid injuring him, which duty may be breached either by active conduct or by omission to act." 45 Corpus Juris, p.

749. The rule applies "with particular force to children of tender years." Idem, p. 757.

In Am. and Eng. Ency. of Law (2nd Ed.), Vol. 21, page 473, there is this succinct statement of the law: "The doctrine that the owner of premises may be liable in negligence to trespassers whose presence on the premises was either known or might reasonably have been anticipated is well applied in the rule of numerous cases, that one who maintains dangerous implements or appliances on uninclosed premises, of a nature likely to attract children in play, or permits dangerous conditions thereon, is liable to a child who is so injured, though a trespasser at the time when the injuries are received. And with stronger reason, where the presence of a child trespasser is actually known to a party or where such presence would have been known had reasonable care been exercised, there may be liability in negligence for injuries sustained—a doctrine acquiesced in by even the strongest advocates of the rule that there is no duty to trespassers."

The attractive nuisance or turntable doctrine which obtains in some states has been repudiated in this jurisdiction. *Ritz v. City of Wheeling*, 45 W. Va. 262; *Uthermohlen v. Bogg's Run Co.*, 50 W. Va. 457; *Conrad v. Railroad Co.*, 64 W. Va. 176; *Martino v. Rotondi*, 91 W. Va. 482. These and similar adjudications make it clear that the gist of the anti-turntable rule is that a proprietor of private property may not be held liable to a trespassing child on account of injuries arising through an instrumentality maintained on such property by the proprietor for legitimate and useful purposes merely because such instrumentality happened to be attractive to children. We adhere to that rule, but it does not apply here. This case goes beyond a situation of mere possible or actual attractiveness to children. It involves the actual presence of a small child at a place of grave danger, and those facts known to the proprietor through its servants there in charge.

Numerous errors are assigned to each of the three instructions given by the court to the jury at the instance of the plaintiff. The criticism which we deem most important and the only one necessary to be discussed is that although the case involved a defense of contributory negligence, and these in-

structions of plaintiff were binding in form, they did not expressly negative the existence of contributory negligence. It was seriously questioned in conference whether the court should not assume as a physiological fact that a child of seven years and a few months could not sufficiently comprehend the danger of asphyxiation from gasoline fumes to be guilty of contributory negligence in exposing himself to the same. If that be sound, the defense of contributory negligence has no place in this case and there was no possible error in omitting special reference thereto from the plaintiff's instructions. In that aspect the giving by the court of defendant's instruction No. 21, covering the defense of contributory negligence, was a gratuity. But, on the theory that the question of the child's alleged contributory negligence was one of fact to be determined by the jury, we proceed with discussion of the matter without regard to the probable soundness of the proposition that the contributory negligence defense should not be entertained at all. Instructions Nos. 1 and 3 were each predicated upon the jury's belief from the evidence that the defendant had failed to use reasonable care and precaution to protect the deceased from injury from the gasoline, and that such failure was the proximate cause of the death of the deceased. Of course, the jury could not have believed that the alleged negligence of the defendant was the proximate cause of the death of plaintiff's decedent and at the same time have believed that the decedent was guilty of negligence which contributed to his own injury. If the defendant's negligent conduct was the proximate cause of the injury, that proposition itself necessarily excludes the idea of contributory negligence, and it is not evident why it was necessary to repeat the thought in the instructions. In *Blake* v. *Interstate Ry Co.*, 57 W. Va. 300, where the court had under consideration an instruction for the plaintiff which omitted specific reference to the defense of contributory negligence, the court said: "While it is true this present instruction does not, in terms, refer to the question of contributory negligence, yet, can it be said to be what is termed a binding instruction, because it tells the jury, 'and that by reason of such negligence he was injured as alleged in his declaration, then the jury shall find

for the plaintiff.' This says to the jury that if the defendant was guilty of negligence, and that, by reason thereof, the plaintiff was injured, then he is entitled to recover, thereby presenting the question to the jury that a verdict must be based upon the negligence of the defendant, which directly caused the injury. If the defendant was guilty as charged in the declaration, and the injury was sustained by reason of its negligence, then it could not have been sustained on account of the contributory negligence of the plaintiff; * * *.'' The most that can be said in criticism of instructions Nos. 1 and 3 in the particular under discussion is that they were incomplete. They were not erroneous in their statements of the law. Now, while the vice of an erroneous instruction is not cured by the giving of a correct one, and inconsistent instructions should not be given, nevertheless, an incomplete instruction may be supplimented by a correct one. Digest Virginia and West Virginia Reports, Vol. 5, p. 893, and cases there cited. And by way of such supplement in the instant case, we look to defendant's instructions Nos. 11 and 21, given. No 11 defines proximate cause. It reads: ''The court instructs the jury that by proximate cause is meant that which in a natural and continual sequence, unbroken by any new cause, produces an event without which the event would not have occurred.'' No 21 covers the defense of contributory negligence as follows: ''The court instructs the jury that if they believe from the evidence in this case that the decedent, James Philip Adams, seven years and five months of age, was sufficiently intelligent and of sufficient experience to appreciate the danger incident to natural gasoline and coming in close contact with the fumes therefrom, and voluntarily went into the ditch or excavation made in the stock pen as shown by the evidence in this case, wherein there was a quantity of natural gasoline, and there became asphyxiated resulting in his death from such fumes, then under the law he is guilty of contributory negligence and his estate cannot recover damages for his death so resulting.'' Reading plaintiff's instructions Nos. 1 and 3 in connection with defendant's instructions Nos. 11 and 21, we perceive no prejudicial error therein. By the two defense instructions noted, the whole matter of proximate cause and

contributory negligence was laid fully before the jury. By plaintiff's instruction No. 2 the jury was told that if they believed from the evidence that defendant, by its employees, at a place where the deceased had a right to be, caused or brought about a dangerous condition without taking precaution to protect the deceased therefrom, "and he was thereby killed," they should find for the plaintiff. This instruction would be correct if the evidence disclosed that the deceased was at a place where he had a right to be at the time of his death. But, as we have already shown, a right to recovery is not limited to such a showing. There may be recovery even though the injured person did not have a right to be at the place of injury. So that this instruction really conceded to the plaintiff less than he was entitled to. It is impossible to perceive prejudice therein to the defendant on that score. Like Nos. 1 and 3, it does not, in express words, negative contributory negligence on the part of the deceased. And, although it does not, like them, contain a proximate cause phrase, it does contain the phrase "and he was thereby killed," that is, by the defendant's bringing about a dangerous condition and failing to take precaution to protect the deceased therefrom. This is not as strong and clear as the language in Nos. 1 and 3, but we think that when supplemented by defendant's Nos. 11 and 21 the jury could not have been misled thereby.

We have made careful examination of numerous cases holding that where there is a defense of contributory negligence, it is error to omit reference to such defense from a hypothetical instruction for plaintiff directing a finding for the plaintiff if certain facts are believed. *Woodell* v. *W. Va. Imp. Co.*, 38 W. Va. 23; *McCreery* v. *R. R. Co.*, 43 W. Va. 110; *McVey* v. *St. Clair Coal Co.*, 49 W. Va. 418; *Blake* v. *Railroad Co.*, 57 W. Va. 300. *Culp* v. *Railway Co.*, 77 W. Va. 125; *Petry* v. *Coal Co.*, 77 W. Va. 654; *Stuck* v. *Railway Co.*, 78 W. Va. 490; *Evans* v. *Kirson*, 88 W. Va. 343; *Ewing* v. *Chapman*, 91 W. Va. 641; *Blackwood* v. *Traction Co.*, 96 W. Va. 1; *Freeman* v. *Traction Co.*, 98 W. Va. 311. But we have not found that any one of them presents a situation containing combined elements such as at bar, that is, (a) the death of a young child, the case

necessarily involving as a question of fact for jury determination, the child's capacity to be guilty of contributory negligence; (b) the challenged instructions of the plaintiff, themselves containing language which strongly, if not entirely, negatives contributory negligence; and (c) instructions of the defendant (1) clearly defining proximate cause and (2) fully covering the defense of contributory negligence. In a situation such as at bar, the said elements all existing, it would be a constrained application of procedural law that would require reversal merely because contributory negligence was not expressly negatived by plaintiff's instructions. Ordinarily, it is reversible error to give for the plaintiff a hypothetical instruction directing a finding for plaintiff if certain facts are believed but omitting reference to contributory negligence where such defense is made, but applicability of that rule in a given case must be determined by the facts and in the light of all the instructions. Like many other procedural rules, it is not invariable in its application.

*McCreery* v. *Railroad, supra,* holds that omission from a binding hypothetical instruction for plaintiff of all reference to facts tending to show contributory negligence when such is a defense cannot be cured by other instructions given on behalf of either party. Some of the other cases cited have repeated that holding without analysis. Maybe the rule is sound where the challenged instruction contains no language which, according to its common acceptation, would convey the idea that the jury should find for the plaintiff only if they believe from the evidence that the injury was caused solely by the defendant's negligent breach of duty, the instruction thereby, by necessary implication, meaning that if the jury believe that the plaintiff negligently contributed to his own injury, he could not recover; but where the instruction does contain such language, there would seem to be reasonable ground for permitting other instructions to be looked to by way of supplement to the challenged instruction, if it, in fact, is not sufficient in itself. This is in entire conformity with the rule that an incomplete instruction may be supplemented. Citation, *supra.* The cases cited in support of the holding in the

*McCreery* case are cases dealing with erroneous and inconsistent instructions, not in point here.

Fourteen instructions were given for the defendant; sixteen were refused. This refusal is assigned as error. One of those refused was peremptory. Most of the others are predicated on the theory that defendant owed to the deceased as a licensee or trespasser no duty other than not to injure him wilfully or wantonly. These ignored the duty devolving upon a proprietor toward a trespasser whose presence was known or should reasonably have been anticipated. Four instructions, not included in the class just mentioned, are 13, 14, 18a and 22. No. 13 pertained to contributory negligence on the part of the deceased. That question was fully covered by No. 21, given. No. 14 would have told the jury that if they believed from the evidence that the deceased had been warned to stay off the premises, and that he disobeyed such warning and that such disobedience was the proximate cause of his death, the jury should find for the defendant. We have already discussed the warning that was given to the boy and have stated our reasons for its non-controlling effect. No. 18a pertained to reasonable care on the part of the defendant, a matter covered by No. 18, given. No. 22 dealt with the question of contributory negligence, which, as already stated, was covered by No. 21.

Six special interrogatories were submitted by the defendant and refused by the court. This is assigned as error. Special interrogatories imply special findings or special verdicts. The statute provides: ''Where any such separate verdict or special findings shall be inconsistent with the general verdict, the former shall control the latter, and the court shall give judgment accordingly.'' Code, chapter 131, section 5. In construing that statute, this court has held: ''The trial court may properly refuse interrogatories, asked for under the provisions of section 5 of chapter 131 of the Code, if they are not so framed as to make an answer to one of them or the answers to all of them fatal to a general verdict against the party requesting them, and entitle him to final judgment on the answer or answers, as the case may be, provided the special

finding or findings are favorable to him." *Lyons* v. *Real Estate Co.* 71 W. Va. 754.

Let us examine the refused interrogatories in the light of the statute and the above interpretation thereof. No. 1. "For what purpose had James Philip Adams, the decedent, gone into the excavation in stock pen No. 2 when and wherein he met his death?" No. 2. "What was James Philip Adams, the decedent, doing in the excavation in stock pen No. 2 just prior to his death?" No. 3. "Did James Philip Adams, the decedent, just prior to his death, voluntarily enter the ditch or excavation wherein he met his death?" These three interrogatories were immaterial. No possible answers thereto, predicated on the evidence, would be controlling of the verdict returned in favor of the plaintiff. For example, answers thereto, most favorable to the defendant, that the deceased had voluntarily gone into stock pen No. 2 as a trespasser for the purpose of getting gasoline that belonged to the defendant, would not only be inconsistent, but would be entirely consistent, with the principles above discussed upon which we hold that the verdict and judgment herein were warranted.

Now as to the remaining interrogatories. No. 4. "Was James Philip Adams, the decedent, guilty of contributory negligence in connection with the cause of his death?" No. 5. "Was James Philip Adams, the decedent, negligent in entering into the excavation wherein he met his death?" No. 6. "If James Philip Adams, the decedent, was negligent in entering the excavation wherein he met his death, did such negligence on his part constitute the proximate cause of his death?" True, affirmative answers to these interrogatories would have been inconsistent with the verdict in favor of the plaintiff, but their propriety and correctness cannot be measured by that standard alone. They were properly refused because they entirely ignore the question of the decedent's capacity to know and appreciate the danger in which he was involved just prior to being overcome by the gasoline fumes. As was correctly stated in defendant's instruction No. 21, the jury could find the plaintiff guilty of contributory negligence if they believed from the evidence that he "was sufficiently intelligent and of sufficient experience to appreciate

the danger incident to natural gasoline and coming in close contact with the fumes therefrom.'' The effect of eliminating that proposition from the last three inquiries was to require special findings by the jury on contributory negligence without the jury's having specifically before it in connection with those inquiries the question of the child's capacity. This did not fully present the whole inquiry on the subject involved. The court properly refused all of the interrogatories.

As to other points of error: The trial court's refusal of defendant's peremptory instruction was proper, likewise the overruling of the defendant's motion to set aside the verdict and award a new trial on the ground that the verdict was contrary to the law and the evidence.

Perceiving no prejudicial error in the record, we affirm the judgment.

*Affirmed.*