**ELK REFINING COMPANY, a corporation, Appellant,**

v.

**Edward Allen MAJHER, an infant under the age of twenty-one years, who sues by Andy Majher, his next friend, Appellee.**

**No. 7069.**

United States Court of Appeals
Fourth Circuit.

Argued Oct. 20, 1955.

Decided Dec. 8, 1955.

William C. Beatty, Huntington, W. Va. (E. A. Marshall, and Fitzpatrick, Marshall, Huddleston & Bolen, Huntington, W. Va., on the brief), for appellant.

C. F. Bagley, Jr., Huntington, W. Va. (Campbell, McNeer & Woods, and L. E. Woods, Jr., Huntington, W. Va., on the brief), for appellee.

Before SOPER and DOBIE, Circuit Judges, and BRYAN, District Judge.

DOBIE, Circuit Judge.

Edward Majher, an infant, (hereinafter referred to as Majher), through his next friend Andy Majher, brought a civil action, seeking damages for personal injuries, in the United States Dis-

trict Court for the Southern District of West Virginia, against the Elk Refining Company, (a corporation hereinafter referred to as Elk). A jury returned a verdict of $10,000 in favor of plaintiff. Elk's motions for judgment *non obstante veredicto* or for a new trial were denied by the District Judge. Elk has duly appealed to us.

On June 18, 1954, Majher was severely burned in attempting to extinguish a fire which he and other boys had ignited with gasoline taken without permission from the premises of Elk, at Huntington, West Virginia. A heavy wire fence encloses these premises on the city side of the flood wall, but the river side of the premises is not fenced.

Elk had established, on the river side, a docking facility for the handling of the cargoes of gasoline barges brought in by river boat. For this purpose, a stationary float containing pumping equipment was moored about ten feet from the shore and was secured by heavy lines running to concrete posts imbedded on the bank. Access to the float is gained by mounting two steps and then proceeding across a ramp about ten feet long and three feet wide. A pipeline runs from the storage tanks over the floodwall and down to the river. When a barge load of gasoline is brought in, it is tied alongside the pump float, and a flexible hose is extended from the pump to the valve on the barge of gasoline and is also connected with the pipeline running to the storage tanks on the other side of the floodwall. The pump is then started, and gasoline is pushed up the floodwall and into the tanks inside. Barges of gasoline are received about once a month; so the arrival of the gasoline barges is comparatively infrequent.

On the morning of the accident, Majher and several companions were playing on Elk's premises. During their play, they observed the barge moored to the float, and they also saw that gasoline was coming out of the flexible hose which was used on the pump. The hose was lying on the pump float, and gasoline was dripping out of it and running into the river.

Around Noon, after they had acquired jars and bottles from the river bank and from their own homes, the boys boarded the barge for the express purpose of obtaining some of the gasoline. There was no gate barring the way over the ramp going out onto the barge and no employee of Elk was present in charge of the float. The testimony of Majher's witnesses was to the effect that the float was not posted with signs. Witnesses for Elk testified that there was a warning sign some three by four feet in dimension on the barge tied to the float. This sign read in effect "No Smoking, No Open Lights, No Visitors."

After the boys had filled their containers with the gasoline, they went down the river from the property of Elk Refining Company to a place they called "the fort." At the "fort" there was an old shanty and a sawed-off garbage can, which was used as a stove. The boys put wood into the garbarge can stove and poured a little gasoline on it in order to facilitate the kindling of a blaze. It was their intent to cook some potatoes. While the boys were preparing their picnic, they took a small quantity of the gasoline and put it in a bottle. They filled this small bottle half full of gasoline and took a piece of paper, wrapped it up, and stuck it into the mouth of the bottle. They then ignited the paper, and when it burned down to the gasoline, the bottle burst open, allowing the gasoline to spill out on the ground. The bottle did not explode, but when the gasoline ran out onto the ground, it was afire. The plaintiff tried to extinguish the fire by stamping on it with his foot. Before he could extinguish the fire, William Saul Riddle deliberately threw gasoline on it. The fire then suddenly blazed up, burning plaintiff's left leg.

Riddle admitted that he knew gasoline was highly inflammable and that, if thrown on a fire, it would burst out into flame. At the time of the accident, Rid-

dle was 14 years old, Majher not quite 10. The ages of the other boys ranged from 7 to 14 years.

There was testimony that boys had played on the river side of Elk's property. Just how often they played and just where are not clear. Rayburn, an Elk employee, testified that two days before the accident he had asked some boys on the flood-wall (which is public property) to watch for an expected barge. He further testified that, on one occasion at least, he had warned some boys to leave the Elk premises. That boys sometimes played on the river-side premises seems clear as is also the fact that Elk's employees knew of this.

The appeal of Elk, seeking a reversal of the judgment below, raises three questions:

(1) Was the evidence introduced sufficient to support a finding of negligence on the part of the defendant?

(2) Was Elk's negligence, if any, the proximate cause of plaintiff's injury?

(3) Was Majher himself guilty of such conduct as would in law bar him from recovery?

In Union Carbide & Carbon Corporation v. Peters, 4 Cir., 206 F.2d 366, 369–370, (a case arising in West Virginia), we said:

"Not every act of carelessness or inadvertence may be characterized as negligence which is actionable in law. One whose conduct falls below the standard prescribed by law, thereby creating a risk of injury to others, is responsible only if danger to others might reasonably be foreseen from such conduct. In this respect, the obligation to guard against the negligent injuring of others is limited to the prevention of those harmful results which reasonable expectability demonstrates are foreshadowed by the risk. As Chief Justice Cardozo stated in Palsgraf v. Long Island R. Co., 248 N.Y. 339, 344, 345, 162 N.E. 99, 100, 101, 59 A.L.R. 1253:

"'The risk reasonably to be perceived defines the duty to be obeyed, and risk imports relation; it is risk to another or to others within the range of apprehension. * * * The range of reasonable apprehension is at times a question for the court, and at times, if varying inferences are possible, a question for the jury.'

"Moreover, before one who has been injured may recover for the alleged negligent conduct of another, he must establish himself as one to whom some duty of care is owed. That is, the injured party must show that the misconduct in question is negligence *as to him*, not to others. As the foreseeability of injury to a certain class or classes of individuals causes conduct to be denominated negligence, so it prescribes the liability therefor. As one text writer has stated it: 'Negligence in the air, so to speak, will not do.' Pollock, Torts, (13th. Ed.) p. 468; see also Prosser, Law of Torts, § 31, Unforeseeable Plaintiffs, p. 182, Rest. Torts, Negligence, § 281, comment c., p. 735."

The "attractive nuisance" doctrine has been repudiated in West Virginia. Tiller v. Baisden, 128 W.Va. 126, 35 S.E.2d 728; White v. Kanawha City Co., 127 W.Va. 566, 34 S.E.2d 17; Martino v. Rotondi, 91 W.Va. 482, 113 S.E. 760, 36 A.L.R. 6. The Supreme Court of Appeals of West Virginia seems to have adopted a less rigid doctrine emphasizing that, in order for liability to exist, (1) the presence of the child at the dangerous instrumentality must have been either known or could have been reasonably anticipated; and (2) the danger of the instrumentality must be hidden, concealed or latent to one who is not familiar with its use. See, the Tiller and White cases just cited. See, also, Richards v. Hope Construction & Refining Co., 121 W.Va. 650, 5 S.E.2d 810. For cases from other states, see, Washabaugh v. Northern Virginia Con-

struction Co., 187 Va. 767, 48 S.E.2d 276; LeDuc v. Detroit Edison Co., 254 Mich. 86, 235 N.W. 832; Morse v. Buffalo Tank Corporation, 280 N.Y. 110, 19 N.E.2d 981. See, also, Restatement of Torts, § 339(a) and (c).

Gasoline is a frequently used substance. Its general attributes are widely known. It might, at least, be classified as potentially dangerous. On account of its volatility, it might (and often does) lead to asphyxiation, particularly in closed places. It is, of course, highly inflammable and exceedingly perilous when exposed to an open flame or to extreme heat. Adams v. Virginian Gasoline & Oil Co., 109 W. Va. 631, 156 S.E. 63. See, also, Morse v. Buffalo Tank Corporation, 280 N.Y. 110, 19 N.E.2d 981.

In the instant case there was nothing *latent* about the danger resulting from the gasoline flowing from the hose. It was in the open air, so that the possibility of asphyxiation was negligible. Nor was there any danger of inflammability inherent in the gasoline itself apart from contact with extreme heat or open flame, which had to be applied extraneously. While these boys may not have been conversant with the extreme volatility of gasoline, they certainly knew of its inflammability; for they took it for the express purpose of making a fire, put some of it into a glass bottle, and affixed a piece of paper, which they lit, as a fuse. See, Richards v. Hope Construction & Refining Co., 121 W.Va. 650, 5 S.E.2d 810. In LeDuc v. Detroit Edison Co., 254 Mich. 86, 93, 235 N.W. 832, 834, it was stated:

"The injury to plaintiff's decedent did not result from any effect of the gasoline unknown to the boys who took it, nor different from the purpose for which it was taken, nor from any inherent danger ignorantly released."

We think the case of Adams v. Virginian Gasoline & Oil Co., 109 W.Va. 631, 156 S.E. 63, is clearly distinguishable. There, a boy, 7 years and 5 months of age, was asphyxiated while playing in the vicinity of a leak in a gasoline pumpline. The court stated, 156 S.E. at page 66:

"This case goes beyond a situation of mere possible or actual attractiveness to children. It involves the actual presence of a small child at a place of grave danger, and those facts known to the proprietor through its servants there in charge."

And cf. Colebank v. Nellie Coal & Coke Co., 106 W.Va. 402, 145 S.E. 748; Wellman v. Fordson Coal Co., 105 W. Va. 463, 143 S.E. 160.

In the light of what has been said, we think there was not sufficient evidence to take the case to the jury, on the question of the negligence of Elk. This, of course, is a ground for the reversal of the judgment below.

We find, in view of what we have previously held, that it is unnecessary to go into the question of whether Majher here was guilty of contributory negligence as a matter of law.

For the reasons stated, the judgment of the District Court is reversed and the case is remanded to that court with instructions to enter judgment in favor of the defendant, Elk Refining Company.

Reversed.