Oscar Vecellio *v.* John H. Bopst, Jr., *Trading, etc.*

(No. 8909)

Submitted October 3, 1939.  Decided October 31, 1939.

*Nathan Patz, Arnold & Crawford,* and *Hartley Sanders,* for plaintiff in error.

*Paul D. Blackshear, Howell M. Tanner* and *Crockett & Gillespie,* for defendant in error.

Kenna, Judge:

This is an action in assumpsit brought in the Circuit Court of Mercer County by Oscar Vecellio against John

H. Bopst, Jr., trading and doing business as Industrial Piping & Engineering Company, the amount sued for being forty-five thousand dollars. Defendant being a resident of Baltimore, Maryland, an attachment was issued with which we are not here concerned. The declaration contains the common counts and in addition thereto a special count based upon a written contract set forth *in extenso*. The defendant filed a special plea setting up the plaintiff's abandonment of his contract, which resulted in damaging the defendant in the amount of $38,573.07, amended by increasing the damages claimed to $38,945.03, for which he asked judgment against the plaintiff and filed in addition a statement of his grounds of defense based substantially upon the same averment. The plaintiff filed a statutory replication, issue was joined, and upon being submitted to a jury, a verdict for $26,196.00 was returned for the plaintiff. This writ was granted upon application of the defendant below.

The first question to be disposed of is one of pleading, the plaintiff in error contending that the verdict is necessarily based in part at least upon the *quantum meruit,* and that this fact necessarily involves an inconsistency since, as stated, the declaration contains both the common counts and a special count, which involve two different causes of action, one based upon the written contract and the other involving its abandonment. Without conceding the soundness of this theory, in our opinion, it is unnecessary to consider it here, due to the fact that it was not raised in the trial court. Neither by demurrer, special plea nor motion was this question presented to the trial judge and passed upon by him. This Court need not consider questions not acted upon by the court below. *Davis* v. *Davis Trust Co.,* 113 W. Va. 43, 166 S. E. 690; *Cameron* v. *Cameron,* 105 W. Va. 621, 143 S. E. 349; *State* v. *Sanney,* 91 W. Va. 477, 113 S. E. 762. This applies particularly to what has resulted in no apparent prejudice.

The trial lasted for six days and the plaintiff's proof involved a mass of documentary evidence the detail of which was not contested. In passing we wish to call at-

tention to Code, 56-7-10, which provides for what may be termed an order of reference in law actions for the purpose of taking an account between the parties. We are under the impression that the hearing of this case might have been simplified by following that practice.

The following, we think, is an accurate statement of the essential facts shown by this record, a detailed statement of which cannot be attempted, the record consisting of more than ten hundred and fifty printed pages:

The defendant, on July 3, 1936, entered into a contract with the plaintiff to partially construct that part of a sewage disposal plant located at South Bluefield, Tazewell County, Virginia, which the defendant had contracted to construct by a previous contract entered into with the City of Bluefield, West Virginia. The construction of the sewage disposal plant was a Public Works Administration project of some magnitude so that the plans and specifications were divided into three parts, apparently the work being classified according to its nature and time for performance. "Contract No. 3" was awarded to Bopst and he employed Vecellio to perform a large part of the construction work allotted to him, such as excavating, concrete foundation, structure work, etc. Vecellio also entered directly into "Contract No. 1," so that he became both a principal and a sub-contractor. Apparently the only complication that was created by this dual relationship was due to the fact that Vecellio did not separate the credit extended to him for materials and equipment, but permitted that under the two contracts to become commingled, which fact, perhaps, involved the expenditure of receipts upon his sub-contract to discharge liabilities based upon his "Contract No. 1." However, there does not seem to have been any *mala fides* involved in this rather awkward status, and surely the complication could not have been developed without the implied consent of the defendant, who, by the exercise of mediocre diligence, could have prevented it from arising. Vecellio was not required to enter into a performance bond and the only effort shown in this record

to have him use his receipts from Contract No. 3 to meet his obligations arising from its performance was a notation placed by Bopst upon a check for $21,525.56 given Vecellio on November 21st to cover October estimates requiring its proceeds to be so used, otherwise, the check to be "void". Obviously, nothing was accomplished.

Vecellio began work July 15, 1936, and carried on until December 17, 1936, when his equipment, machinery, and materials were taken into the possession of the principal contractor, who retained some of his employees as well. We are under the impression that the principal part of the questions raised in this case turn upon the answer to the query as to whether this was justified as being predicated upon a voluntary abandonment or default on the part of Vecellio, or whether it constituted a breach of the contract on the part of Bopst, in which event the recovery by Vecellio is justified. From the record, it seems obvious that the construction cost of the part of the work covered by Vecellio's sub-contract exceeded the contract price named in that contract.

Apparently Vecellio did very satisfactory work, keeping up with the schedule both as to quantity and kind of his work until late in November. Sometime before December first, forms were removed from a concrete "pour" intended for the pumping station wall. The concrete was found perforated and admittedly not in compliance with the specifications. The City of Bluefield, acting through Knowles and Company, declined to accept it or include it in the amount estimated to be payable to the contractor for the month of November. The engineer representing the city did agree that the original pour should be "gunited", but insisted that that should be done by persons having had at least two years experience as operators. This led to the engineer's not permitting a Fairmont firm that Vecellio arranged for to proceed with the work, which was not finally done until after Vecellio had ceased performance on December 17, 1936.

There is irreconcilable conflict in the testimony as to what occurred after the defective concrete was discovered,

Vecellio's version being that the supervising engineer was at fault (Jupenlaz) and that he looked to the principal contractor to enforce his rights under the principal contract and subrogate him in turn; that he carried on with the contract to the extent that weather conditions would permit until it was breached by the defendant. Bopst, on the other hand, contends that from the latter part of November, Vecellio was continuously in default, and that as the fifteenth day of December approached (being the date upon which the sub-contract provided it.should be "substantially" performed and also provided a way by which liquidated damages would be arrived at for any delay encountered), he was simply seeking a way out, having completed the more profitable part of the construction work embraced in the sub-contract. It will be seen that, the sub-contract not having been carried out, the basic contention is whether it was breached by Vecellio or by Bopst. The other questions, we believe, we will then find to be secondary, and to rest, in the main, upon the manner in which the leading question is dealt with.

Paragraph five of the sub-contract entered into between the plaintiff and the defendant reads as follows:

"In the event of the failure on the part of the Sub-Contractor to furnish a sufficiency of labor and materials acceptable to the Builder or their Authorized Representative in charge of the work as required by the progress of the work, or by the Engineer, the Builder may, after three days' written notice to the Sub-Contractor, provide such labor or materials, and deduct the cost thereof from any money then due or thereafter to become due to the Sub-Contractor under this contract; and if such refusal, neglect or failure is, in the judgment of the Engineer sufficient ground for such action, the Builder shall also be at liberty to terminate the employment of the Sub-Contractor under this contract and to enter upon the premises and take possession for the purpose of completing the work included under this contract, of all materials, tools and appliances there-

on, and to employ any other person, persons or corporations, to furnish the work, and to provide the materials therefor; and in case of such discontinuance the Sub-Contractor shall not be entitled to receive any further payments under this contract until the said work shall be wholly finished, at which time, if the unpaid balance of the amount contracted to be paid hereunder shall exceed the expense incurred by the builder in finishing the work such excess shall be paid by the Builder to the Sub-Contractor; but if such expense shall exceed such unpaid balance, the Sub-Contractor shall forthwith pay the difference to the Builder. The expense incurred by the Builder as herein provided, either for furnishing materials or finishing the work, and any damages incurred through such default, shall be chargeable to the Sub-Contractor."

A careful reading of this paragraph indicates that it contemplates dealing with the sub-contractor's failure to live fully up to his contract by two different methods, dependent, apparently, upon the degree of that failure. The first clause of this paragraph seems to deal with eventualities that arise from the fact that the sub-contractor, while doing satisfactory work, is using labor and materials in insufficient quantities to keep up with the expected time of performance. In that event, the contract provides that the Builder (Bopst), after three days written notice to the sub-contractor, may make up for the deficiency in both labor and materials, it not being provided that the sub-contractor shall be ousted from the work, but, by implication, that the work shall go on with his labor and materials plus those furnished by the Builder. This course was not taken.

The only other provision of this paragraph accords to the Builder the right to do certain things, the result of which terminates the sub-contractor's right under the contract, the taking over of his materials, tools and appliances and the Builder completing the work provided for in the sub-contract. This latter provision, however, is based upon the neglect or failure of the sub-contractor

being, "in the judgment of the engineer sufficient grounds for such action."

On December 12, 1936, Bopst from Baltimore, the location of his principal office, wrote Vecellio the following letter:

> "Under the provisions of our contract with you for performing certain work for us in connection with our contract for The Sanitary Board of the City of Bluefield, W. Va., for the construction of the Bluestone Sewage Treatment Plant, Contract #3: this is your official notice from us that we are exercising our rights under Paragraphs four (4) and five (5) of your contract with us and after three days from this written notice will provide such labor, materials or services, etc. to complete your work at your expense. You will further be held accountable for all other provisions, paragraphs, etc. of your contract with us."

On December fifteenth, he wired the Bluefield Sanitary Board as follows:

> "Relet December Twelfth Action was taken last week to correct unsatisfactory work and we have notified our sub-contractor in writing that we must exercise our rights under Paragraph Four and Five of his Contract with us meaning that to avoid unnecessary delay we will prosecute his work to completion."

Clearly, the defendant took possession and control of Vecellio's tractors, trucks, equipment and material, including a bridge constructed across Bluestone River, the blacksmith shop and office building, on the morning of December seventeenth. We find no clause in the sub-contract justifying this course of conduct without the engineer's prior approval.

There is no showing that the judgment of the engineer approving Bopst's course of conduct as being based upon sufficient ground was ever sought or expressed. Wilfred Jupenlaz, the engineer's representative on the ground

and the supervisor of construction, was not placed on the witness stand. On the other hand, F. J. Sheppard, Bopst's superintendent in charge of construction, without objection, stated that upon cross-examination that he did not advise the writing of the letter of December twelfth.

The plaintiff in error advances the theory that this letter did not constitute a breach of contract on the part of Bopst. Due to the statement contained in the letter that after three days written notice the Builder (Bopst) "will provide for such labor, materials or services, etc., to complete your work at your expense", we think this contention is open to serious question. The plaintiff in error advances also the contention that if the letter of December twelfth should be regarded as a breach of contract, Bopst retracted it before it was acted upon by Vecellio.

We are under the impression that both of these contentions must be considered in the light of Bopst's conduct and what transpired after he wrote the letter of December twelfth, and whether that is consistent with his present interpretation of that letter. Bopst took the stand and stated that he did not write the letter of December twelfth to Vecellio for the purpose of getting him to quit the contract, but for the purpose of having a "showdown"; to "stir him up." In justification for this course, he stated that he consulted with "this PWA man", and was shown by him a paragraph in the general contract which the witness read from the stand. The topical heading of this paragraph is "Termination for Breach", or the exact contrary of what Bopst now states was his purpose. We think the finding of the jury that Bopst breached the contract with Vecellio was based upon sufficient proof.

Another contention advanced by the defendant below is that Vecellio breached his contract because an express provision made time of the essence of the sub-contract and it became evident that the work could not be finished by December fifteenth. To our mind there are prevailing material provisions of the contract which are entirely inconsistent with this express provision. The sub-contract

contains a clause providing that it shall be "substantially" completed by December fifteenth. This is not the nature of a contract in which time is of the essence. The subcontract also contains a provision for liquidated damages to be arrived at by the engineer, evidently to be imposed if the sub-contractor's undertaking is not "substantially" completed by December fifteenth. There is no definition of the term "substantially completed" contained in the contract. The general rule at law formerly was that a contract which, in terms, makes time of the essence will be strictly enforced. However, the present tendency is to follow the chancery rule of construction, and, unless the contrary clearly appears, assume that there was no intention to provide that time for performance should be considered of the essence of the contract. We have made a rather exhaustive examination of the digests and have been able to find but one case based upon a similar contract. The case of *Hunn* v. *Pennsylvania Institution,* 221 Pa. 403, 70 Atl. 812, 18 L. R. A. (N. S.) 1248, involved a contract which contained a clause almost identical with the one here under consideration, with the exception that the contract apparently had no express provision making time of the essence. The Pennsylvania Supreme Court held that the provision for liquidated damages for delay would not permit the construction that the purpose of the parties was to make time of performance of the essence of the contract.

The contention is advanced that the plaintiff sought to recover the rental value only of his property which Bopst took possession of, and that as there is no proof of rental value in this record, it follows that the jury's verdict is based upon an incorrect theory. We think that even a cursory reading of the declaration and of the court's instructions shows that advancing this contention is not justified.

As to the excessiveness of the verdict, it is rather difficult to devise a theory under which excessiveness can be arrived at. After verdict in favor of the plaintiff, of course, all the conflicting testimony, including that re-

lating to the amount of recovery, is to be viewed in favor of the plaintiff. Treating Bopst's possession of his tools, equipment and materials as being a conversion and regarding the plaintiff's proof as to their value as being preponderating, it will be found that this justifies a recovery of $22,417.18. In order to more than equal the verdict and judgment for $26,196.00, a retained percentage based upon the estimate for the actual work done by the plaintiff and unpaid of $4,700.00 more than totals the amount of the verdict. This is another question that was not raised nor passed upon in the trial court.

There are several other ways that the amount of this verdict can be justified, and there having been no specific interrogatories propounded to the jury involving the amount of recovery, we cannot disapprove of the verdict.

Perceiving no apparent error prejudicial to the plaintiff in error, the judgment of the Circuit Court of Mercer County is affirmed.

*Affirmed.*