528 S.E.2d 475

Marvin T. BOWERS, et al., as Class Representatives, Plaintiffs Below, Appellants,

v.

Gretchen WURZBURG, the Southland Corporation, et al., Defendants Below, Appellees.

No. 26218.

Supreme Court of Appeals of West Virginia.

Submitted Sept. 22, 1999.

Decided Dec. 16, 1999.

Dissenting Opinion of Justice Davis April 12, 2000.

Paul G. Taylor, Esquire, Martinsburg, West Virginia, Attorney for Appellants.

Charles G. Printz, Jr., Esquire, Bowles Rice McDavid Graff & Love, Martinsburg,

West Virginia, Attorney for Appellee Gretchen Wurzburg.

Lester Sotsky, Esquire (Pro Hac Vice), Arnold & Porter, Washington, DC, Attorney for Appellees Yakado, Ltd., et al.

McGRAW, Justice:

The appellants herein and plaintiffs below, Marvin T. Bowers, Bessie C. Bowers, Esta M. Bell, and John R. Bell (hereinafter "the plaintiffs"), appeal a December 17, 1998, order of the Circuit Court of Jefferson County granting summary judgment in favor of appellee herein and defendant below Gretchen Wurzburg, whom appellants had sued (along with other parties) for damages resulting from a gasoline leak at a 7–11 convenience store near Shepherdstown, West Virginia. For reasons set forth below, we reverse the lower court's grant of summary judgment.

## I.

### FACTUAL AND PROCEDURAL HISTORY

This represents our third encounter, to date, with this case. The underlying lawsuit stems from a leak of gasoline at a 7–11 convenience store located near Shepherdstown, West Virginia. Like many stores of its kind, this 7–11 offered self-service gasoline sales, the gasoline being stored in underground tanks. At some point in late 1994, some 10,000 gallons of gasoline leaked from the tanks, migrating onto the properties of the plaintiffs. On the ironic date of December 7, 1994, the leaking gasoline caught fire, and produced an explosion in the home of Mr. and Mrs. Bowers. As a result, the other plaintiffs were forced to evacuate their homes for various lengths of time, and suffered other damages.

Consequently, the plaintiffs filed a class action suit[1] in the Circuit Court of Jefferson

County against the owner of the property upon which the 7–11 was situated, Gretchen Wurzburg; the company that leased this property and owned and operated the 7–11 store, the Southland Corporation ("Southland"); and three foreign companies who hold a financial interest in Southland, to whom we shall refer to as Ito, IYG, and SEJ.[2]

Without reiterating verbatim the facts of the last two appeals, we find it necessary to provide some background information. The plaintiff's first appeal was a result of the lower court's dismissal of the foreign defendants for lack of personal jurisdiction. We found in *Bowers v. Wurzburg*, 202 W.Va. 43, 501 S.E.2d 479 (1998) ("*Bowers I* "), that the lower court had erred when it refused to permit discovery on the issue of personal jurisdiction. Without specifically deciding the jurisdictional question, we remanded this case to the Circuit Court of Jefferson County for the pursuit of discovery regarding the court's personal jurisdiction over the foreign defendants. See *Bowers I*, 202 W.Va. at 52–53, 501 S.E.2d at 488–89.

The next appeal resulted from the lower court's decision to dismiss the foreign companies for insufficient service of process. Although we agreed that the plaintiffs had not served the defendants properly, in *Bowers v. Wurzburg*, 205 W.Va. 450, 519 S.E.2d 148 (1999) ("*Bowers II* "), we modified, in part, the circuit court's decision, and remanded the case in order to allow the plaintiffs to effect proper service upon the foreign defendants.

This time around, it is the resident defendant, property owner and landlord, Gretchen Wurzburg, whom the lower court has dismissed from the action. On October 30, 1998, the lower court granted appellee Wurzburg's motion for summary judgment, which became final in an order dated December 17, 1998. It is from this order that the plaintiffs now appeal.[3]

---

**1.** Appellees suggest that the lower court has refused to certify this lawsuit as a "class action," but such a distinction is irrelevant to our analysis in this opinion.

**2.** The Southland Company, the original operator of 7–11 stores throughout the United States, went bankrupt in 1990. A consortium of Japanese companies purchased a majority of Southland after that bankruptcy. Those companies are

Ito–Yokado Co., Ltd. ("Ito"), IYG Holdings ("IYG"), and Seven Eleven Japan Co., Ltd. ("SEJ"). SEJ is a subsidiary of Ito. IYG is a holding company jointly owned by Ito and SEJ, and is a subsidiary of Ito and SEJ. None of the Japanese companies were involved in the original deal between Ms. Wurzburg and Southland.

**3.** Appellees maintain that we should affirm the lower court because plaintiffs did not develop

Facts relevant to the instant appeal reveal that Ms. Wurzburg and her late brother Willard developed several convenience stores in the eastern panhandle of West Virginia in the late 1970's. Specifically, on November 1, 1977, the Wurzburgs entered into a lease agreement with Southland whereby the Wurzburgs would construct on their land a building that Southland would lease and operate as a 7–11 store.

In that lease, the Wurzburgs agreed to construct a building on their land in which Southland would operate the store. The Wurzburgs also agreed to maintain the structural integrity of the building, but Southland was to be responsible for all other maintenance and upkeep. Southland was to pay a base rent each month, in addition to a percentage of the store's gross sales.

Shortly after the signing of the November 1, 1977, lease, the parties signed the January 16, 1978, lease, in which the Wurzburgs agreed to let Southland construct and install pipes, pumps, and tanks necessary for the sale of gasoline. Southland also agreed in the second lease to maintain liability insurance and to hold the Wurzburgs harmless in the event others were harmed as a result of the sale of gasoline. Sales of gasoline were not included in the figures used to calculate the gross sales percentage agreed to by Southland in the earlier lease.

Wurzburg maintained in her motion for summary judgment that she had nothing to do with the operation of the 7–11 store, had no control over the day-to-day operations, was unaware of any problems with the gas storage tanks, and owes no duty to the plaintiffs. The lower court agreed, granting Ms. Wurzburg's motion for summary judgment, and subsequently denying plaintiffs' motion for reconsideration. Because we find that questions of material fact remain, we reverse the decision of the lower court.

## II.

### STANDARD OF REVIEW

■ Our standard of review of motions for summary judgment is well established

and well known: "A motion for summary judgment should be granted only when it is clear that there is no genuine issue of fact to be tried and inquiry concerning the facts is not desirable to clarify the application of the law." Syl. pt. 3, *Aetna Casualty & Sur. Co. v. Federal Ins. Co. of New York*, 148 W.Va. 160, 133 S.E.2d 770 (1963). Furthermore, "[a] party who moves for summary judgment has the burden of showing that there is no genuine issue of fact and any doubt as to the existence of such issue is resolved against the movant for such judgment." *Id.* at Syl. pt. 6. Our review of such motions is *de novo*. *Painter v. Peavy*, 192 W.Va. 189, 451 S.E.2d 755 (1994).

## III.

### DISCUSSION

#### A. *The Restatement Argument*

■ First we note that, when considering landlord or tenant liability for injuries to a third party, "the general principle [is] that once a property is leased, the tenant is liable for injuries to third persons [that] are caused by the condition of the demised premises." *Andrick v. Town of Buckhannon*, 187 W.Va. 706, 708, 421 S.E.2d 247, 249 (1992). *See also, Cowan v. One Hour Valet, Inc.*, 151 W.Va. 941, 157 S.E.2d 843 (1967).

■ However, under certain circumstances, when a landlord knows that the tenant is engaging in potentially dangerous activity, the landlord may be liable for the actions of the tenant, even if that dangerous activity has harmed someone outside of the leased premises. Courts make such an exception to the general rule of landlord immunity to prevent a landlord from knowingly profiting (via the receipt of rent) from certain dangerous activities while passing the liability buck onto the tenant.

their appellate arguments adequately below. Perhaps because the record in this case has made several trips to Charleston, not all of the relevant documents are contained in the file. However, it appears that in granting summary judgment the trial court did consider the sub-

stantive issues raised by the plaintiffs, and did not dispose of the case on the basis of some procedural dereliction on their part. Thus our consideration of plaintiffs' arguments is appropriate.

In a case where a plaintiff, injured in a gas station explosion, sued the lessee operator as well as the lessor/owner of the property, the Ohio Court of Appeals reversed a directed verdict in favor of the landowner, stating: "Thus, there is simply no case to be made consistent with reality as to why the law should not provide the public with a remedy against a landlord out of possession and control who rents a powder factory to a known pyromaniac." *Benlehr v. Shell Oil Co.*, 62 Ohio App.2d 1, 402 N.E.2d 1203, 1207 (1978).

This concept of imposing liability on a landlord for the actions of a tenant is best explained by reference to the Restatement (Second) of Torts:

A lessor of land is subject to liability for physical harm to persons outside of the land caused by activities of the lessee or others on the land after the lessor transfers possession if, but only if,

(a) the lessor at the time of the lease consented to such activity or knew that it would be carried on, and

(b) the lessor knew or had reason to know that it would unavoidably involve such an unreasonable risk, or that special precautions necessary to safety would not be taken.

Restatement (Second) of Torts § 379A (1963–1964).

Before continuing our discussion, we pause to explain the interrelated nature of several restatement provisions, namely Restatement (Second) of Torts §§ 379A and 837, and Restatement (Second) of Property § 18.4 (1976). First, we note that Restatement (Second) of Property is almost identical to Restatement (Second) of Torts § 379A.[4]

Second, we note that the authors of Restatement (Second) of Torts § 379A, quoted above, emphasize the similarity between that section and another. In the comment to

Restatement (Second) of Torts § 379A, the authors write: "The rule stated in this Section is closely related to that stated in § 837 as to the liability of the lessor for a nuisance on the land, and should be read together with that Section. The Comments to § 837 are applicable so far as they are pertinent." Restatement (Second) of Torts § 379A, comment a (1963–1964). Section 837, in full, reads as follows:

(1) A lessor of land is subject to liability for a nuisance caused by an activity carried on upon the land while the lease continues and the lessor continues as owner, if the lessor would be liable if he had carried on the activity himself, and

(a) at the time of the lease the lessor consents to the activity or knows or has reason to know that it will be carried on, and

(b) he then knows or should know that it will necessarily involve or is already causing the nuisance.

(2) A vendor of land is not liable for a nuisance caused solely by an activity carried on upon the land after he has transferred it.

Restatement (Second) of Torts § 837 (1977). With the interconnectedness of these three sections in mind, we turn to their use by other jurisdictions.

Many states have adopted the language of the above-referenced restatements of the law, in some form or another.[5] The most common application of the restatement logic is in dog bite cases, where a third party, bitten by a tenant's vicious dog, seeks compensation from the landlord as well. *See, Uccello v. Laudenslayer*, 44 Cal.App.3d 504, 118 Cal.Rptr. 741 (1975) (landlord cannot sit idly by in the face of known danger); *Strunk*

---

4. A landlord is subject to liability for physical harm to persons outside the leased property caused by activities of the tenant or others on the leased property after the landlord transfers possession only if:
  (1) the landlord at the time of the lease consented to the activity or knew that it would be carried on; and
  (2) the landlord knew or had reason to know that it would unavoidably involve an unreasonable risk, or that special precautions necessary to safety would not be taken.

Restatement (Second) of Property § 18.4 (1976).

5. *See, Bischofshausen, etc. v. D.W. Jaquays Min.*, 145 Ariz. 204, 700 P.2d 902 (Ct.App.1985) (adopting Restatement of Torts (Second) § 837); *Commonwealth v. DeLoach*, 714 A.2d 483 (Pa. Cmwlth.1998) (comparing criminal liability under ordinance to civil liability under Restatement (Second) of Torts § 837); *Koch v. Randall*, 136 N.H. 500, 618 A.2d 283 (1992) (referencing Restatement (Second) of Torts § 837).

*v. Zoltanski,* 62 N.Y.2d 572, 479 N.Y.S.2d 175, 468 N.E.2d 13 (1984) (landlords, as others, must exercise reasonable care not to expose third parties to unreasonable risk of harm); *Park v. Hoffard,* 315 Or. 624, 847 P.2d 852 (1993) (landlord can be liable for injuries to a third party from an attack by tenant's dog off the rental premises).

In a case with facts similar to the instant case, a Colorado court overturned a grant of summary judgment to a defendant landowner, when a tenant allowed methane gas to escape from the property and explode, injuring a third party. The court based its decision on the logic of § 379A: "Under certain circumstances, a lessor may be held liable for physical harm which resulted from a dangerous condition on this land even though he retains no control over it. *See, e.g., Restatement (Second) of Torts § 379A.*" *Salazar v. Webb,* 44 Colo.App. 429, 618 P.2d 706, 707 (1980) (footnote omitted).

Another case where an appellate court reversed an award of summary judgment for a defendant landowner is the New Mexico case of *Bober v. New Mexico State Fair,* 111 N.M. 644, 808 P.2d 614 (1991). In that case, a plaintiff sued the New Mexico State Fair for injuries she sustained when a car, exiting the state fair grounds after a rock concert, struck and injured her. She alleged that the state should have taken steps, such as installing traffic control devices or deploying policemen, to ensure that the thousands of cars exiting the fair grounds could do so in a safe and orderly manner. The State Fair defended, in part, on the basis that it had leased the fairgrounds to a promoter, and it was the promoter who should bear liability for the accident. The plaintiff relied, in part upon section 379A of the restatement:

> Third, Bober also invokes the rule in Section 379A of the *Restatement (Second) of Torts* ... The State Fair responds that Bober made no showing that it knew of any unreasonable risks; but this, of course, overlooks the fact that the burden was on the Fair, as the party moving for summary judgement, to adduce some evidence that it was unaware of the danger of an accident arising from a large number of cars exiting

the Fairground at one time following an event like the concert at Tingley Coliseum.

> We hold that the State Fair could not escape liability to Bober merely by showing that it had leased the Coliseum to [the promoter] for the day and night of the rock concert.

*Bober v. New Mexico State Fair,* 111 N.M. 644, 808 P.2d 614, 622 (1991).

Appellant points us to the South Dakota case of *Easson v. Wagner,* 501 N.W.2d 348 (1993). In that case, the defendant tenant injured the plaintiffs when blasting on adjacent property, sending a shower of rocks onto the plaintiffs' home. The lower court had granted the defendant landlord's motion for summary judgment, but the Supreme Court of South Dakota reversed, applying and summarizing the restatement language:

> Thus the claim ... gives rise to two questions of fact: whether the landlord knew of, or consented to, the tenant's activity which caused the harm and whether he [or she] realized the risks associated with that activity. If the expected operations under the lease result in a reasonably anticipated injury, the landlord cannot disclaim liability.

*Easson v. Wagner,* 501 N.W.2d 348, 351 (1993) (citations omitted). Another aspect of *Easson* emphasized by the plaintiffs, is that the defendants in that case, like Ms. Wurzburg, had also received guarantees of insurance coverage and indemnification from their tenants:

> Certainly, mandating insurance coverage and indemnification evinces a recognition by Eggers that mining the Ballard Claim carried with it risks from which liability could result to them as the landowners. The extent of Eggers' appreciation of the risks associated with mining under § 18.4(2), however, raises a question of fact a jury must decide.

*Id.* While we by no means wish to discourage tenants from obtaining proper insurance to cover themselves or their landlords in the event of an accident like this one, we agree that the existence of insurance and indemnification agreements provides and indication of the risk perceived by the landlord.

██ We concur with the reasoning of *Easson* and the foregoing cases, and thus adopt the language of the Restatement (Second) of Torts § 379A and Restatement (Second) of Torts § 837. A landowner who knows or should know that his or her tenant is conducting potentially dangerous activities on the leased premises cannot hope to avoid liability by simply avoiding knowledge of the conduct at issue.

Appellee Wurzburg points out a difference between this case and our instant case; *Easson* involves blasting, an abnormally dangerous activity, and one recognized as such in this State. *See, e.g., Whitney v. Ralph Myers Contracting Corp.*, 146 W.Va. 130, 118 S.E.2d 622 (1961). Appellee argues that the restatement language we have quoted above requires the tenant's activity to unavoidably involve an unreasonable risk before liability could pass to the landlord; in other words, she argues, if selling or storing gasoline is not abnormally dangerous, like blasting, Ms. Wurzburg cannot be liable under Restatement (Second) of Torts § 379A.

Appellee goes on to point out that dicta in our case of *Peneschi v. National Steel Corp.*, 170 W.Va. 511, 295 S.E.2d 1 (1982), suggests that storing "gasoline in a filling station" should not be considered an abnormally dangerous activity; that is, because we all go to gas stations on a regular basis without preparing a will, gas stations must not pose an "unreasonable risk." [6]

**6.** The instant case involves the sale of gasoline. While we recognize that gas stations are a necessary and integral part of our present society, we are also aware of the inherent dangers the production, transportation, storage, and sale of gasoline present, and we have long considered gasoline to be a dangerous instrumentality:

The volatile and dangerous nature of gasoline is recognized by the courts. *Shaffer Oil Co. v. Thomas*, 120 Okl. 253, 252 P. 41; *Gibson Oil Co. v. Sherry*, 172 Ark. 947, 291 S.W. 66, 67, wherein it was said: "Gasoline becomes volatile when exposed to the air and is easily ignited when it comes in contact with a flame. Therefore gasoline is, also, a highly dangerous substance, and the same rule applies to it as above stated with regard to gas." To the same effect are *Sedita v. Steinberg*, 105 Conn. 1, 134 A. 243, 49 A.L.R. 154, and *Hunt v. Rundle*, 10 La.App. 604, 120 So. 696.

*Adams v. Virginia Gasoline & Oil Co.*, 109 W.Va. 631, 636–37, 156 S.E. 63, 65–66 (1930)

In *Peneschi*, we discussed the theory of strict liability for the use of dangerous instrumentalities, as propounded in the seminal English case of *Rylands v. Fletcher*, L.R. 3 H.L. 330 (1868). As we explained: "The basic principle of *Rylands* is that where a person chooses to use an abnormally dangerous instrumentality he is strictly liable without a showing of negligence for any injury proximately caused by that instrumentality." *Peneschi*, 170 W.Va. at 515, 295 S.E.2d at 5.

We first addressed the *Rylands* theory of strict liability in a case involving the collapse of a water tower, in which the Court quoted *Rylands* at some length:

We think that the true rule of law is that the person who for his own purposes brings on his lands and collects and keeps there anything likely to do mischief if it escapes, must keep it in at his peril, and, if he does not do so, is *prima facie* answerable for all the damage which is the natural consequence of its escape.... But for his act in bringing it there no mischief could have accrued, and it seems but just that he should at his peril keep it there so that no mischief may accrue, or answer for the natural and anticipated consequences. And upon authority this we think is established to be the law whether the things so brought be beasts, or water, or filth, or stenches.

*Weaver Mercantile Co. v. Thurmond*, 68 W.Va. 530, 535, 70 S.E. 126, 128 (1911) (quoting *Rylands, supra* ).[7]

(Holding that gasoline is a dangerous instrumentality). It is obvious that one must take special precautions to use it safely, and one must remain vigilant in guarding against accidents. "The courts take judicial notice that gasoline and other inflammable petroleum products, gunpowder, and dynamite, are dangerous and explosive, as a matter of common knowledge." *State ex rel. Oil Service Co. v. Stark*, 96 W.Va. 176, 183, 122 S.E. 533, 536 (1924) (citations omitted).

**7.** Interestingly, the arguments of the defendant in the *Weaver* case sound much like that of Ms. Wurzburg:

Defendant, in the present case, had leased the hotel to his son, J.S. Thurmond, who was in possession at the time of the injury complained of, and it is contended that, as there was no agreement by the lessor to make repairs, he is not liable.

*Weaver*, 68 W.Va. at 535–36, 70 S.E. at 129.

This is true of items that are inherently dangerous, such as gunpowder, *see, Wilson v. Phoenix Powder Mfg. Co.*, 40 W.Va. 413, 21 S.E. 1035 (1895), as it is of items that may not be initially dangerous, such as ordinary household garbage in a city dump. We noted as much in a case where the City of Hinton allowed a dump to engulf the home of a Hinton resident:

[P]ersons who, for their own profit, bring onto their premises, and collect and keep there anything, which if it escapes, will do damage to another, are liable for all consequences of their acts, and are bound at their peril to confine it and keep it on their own premises.

*Adkins v. City of Hinton*, 149 W.Va. 613, 142 S.E.2d 889 (1965) (citing *Mayes v. Union Carbide & Carbon Corporation*, 143 W.Va. 336, 101 S.E.2d 864 (1958)).[8]

*Peneschi* is an important case, because it traces the history of this State's application of *Rylands*. In tracing this history, it becomes clear that our application of the *Rylands* doctrine (at least pre-*Peneschi*) was all over the map, but the *Peneschi* court made it clear that we should apply the *Rylands* doctrine as it had been expressed in the Restatement (Second) of Torts §§ 519 and 520 (1976). Though lengthy, we feel it important to quote the restatement and part of its comment to explain our holding in this case:

§ 519. GENERAL PRINCIPLE

(1) One who carries on an abnormally dangerous activity is subject to liability for harm to the person, land or chattels of another resulting from the activity, although he has exercised the utmost care to prevent the harm.

(2) This strict liability is limited to the kind of harm, the possibility of which makes the activity abnormally dangerous.

§ 520. ABNORMALLY DANGEROUS ACTIVITIES

In determining whether an activity is abnormally dangerous, the following factors are to be considered:

(a) existence of a high degree of risk of some harm to the person, land or chattels of others;

(b) likelihood that the harm that results from it will be great;

(c) inability to eliminate the risk by the exercise of reasonable care;

(d) extent to which the activity is not a matter of common usage;

(e) inappropriateness of the activity to the place where it is carried on; and

(f) extent to which its value to the community is outweighed by its dangerous attributes.

Restatement (Second) of Torts §§ 519 and 520 (1976). Ms. Wurzburg maintains that selling and storing gasoline cannot meet this test; because the test of § 520 is not met, neither is the test of § 379A. However, the comment on clause (c), above, clarifies this issue:

There is probably no activity, unless it is perhaps the use of atomic energy, from which all risks of harm could not be eliminated by the taking of all conceivable precautions, and the exercise of the utmost care, particularly as to the place where it is carried on. Thus almost any other activity, no matter how dangerous, in the center of the Antarctic continent, might be expected to involve no possible risk to any one except those who engage in it. **It is not necessary, for the factor stated in Clause (c) to apply, that the risk be one that no conceivable precautions or care could eliminate. What is referred to here is the unavoidable risk remaining in the activity, even though the actor has taken all reasonable precautions in advance and has exercised all reasonable care in his operation, so that he is not negligent.** The utility of his conduct may be such that he is socially justified in proceeding with his activity, but the unavoidable risk of harm that is inherent in it requires that it be carried on at his peril, rather than at the expense of the innocent person who suffers harm as a result of it. Restatement (Second) of Torts § 520, Comment on clause (c) (1976) (emphasis added).

8. Discussed in *Peneschi,* 170 W.Va. at 520, 295 S.E.2d at 10.

■ Thus, the comment above dismisses our conflict between the section 379A language and the "abnormally dangerous" language of *Rylands*. It is not necessary for a plaintiff to prove that all gas stations are in imminent danger of leaking or exploding to find liability under 379A. As the comment above notes, "[w]hat is referred to here is the unavoidable risk remaining in the activity, even though the actor has taken all reasonable precautions...." *Id.* Thus we hold that the storage, sale, or distribution of gasoline is subject to the same *Rylands* analysis, as expressed in Restatement (Second) of Torts §§ 519 and 520 (1976), that we would apply to any other activity involving similar or greater danger to the public.

■ Because this case has not gone to trial, we do not know precisely what precautions Southland used or should have used in handling its gasoline. Plaintiffs also contend that area residents had noticed a persistent odor of gasoline for some time prior to the explosion. Consequently, viewing the facts in the light most favorable to the plaintiffs, as we must when considering a motion for summary judgment, we feel that a jury should consider the issue of Ms. Wurzburg's liability.

## B. *Joint Venture*

■ Plaintiffs argue that Ms. Wurzburg should be found liable on the basis that she is a co-adventurer or joint venturer with Southland in the operation of the store. In support of this argument, plaintiffs note that Southland paid Ms. Wurzburg a percentage of gross sales in addition to the base rent. Although sales of gasoline were not included in that figure, plaintiffs argue that, by offering gasoline to customers, Southland increased its overall sales, thus increasing Ms. Wurzburg's income. We have defined the term "joint venture" as follows:

> A joint venture or, as it is sometimes referred to, a joint adventure, is an association of two or more persons to carry out a single business enterprise for profit, for which purpose they combine their property, money, effects, skill, and knowledge. It arises out of a contractual relationship between the parties. The contract may be oral or written, express or implied.

Syl. pt. 2, *Price v. Halstead,* 177 W.Va. 592, 355 S.E.2d 380 (1987); Syl. pt. 4, *Sipple v. Starr,* 205 W.Va. 717, 520 S.E.2d 884 (1999); accord, *Johnson v. State Farm Mut. Auto. Ins. Co.,* 190 W.Va. 526, 438 S.E.2d 869 (1993).

In *Sipple,* we addressed a similar question regarding the effect of gasoline sales upon the sale of non-gas items. In that case, the plaintiff below argued that the owner/operator of a convenience store was engaged in a joint venture with the distributor who supplied gasoline to the store:

> Although Starr [the owner/operator] did not pay directly to PPI [the distributor] some fractional share of every sale of beer or groceries, PPI still could be said to have profited from those sales. It is possible that a jury could find that, the more customers attracted to the Rocket Mart to buy non-gas products, the more potential customers for PPI gasoline, and the converse as well. We feel a jury should be able to consider whether the arrangement produced mutual benefit for both Starr and PPI.

*Sipple v. Starr,* 205 W.Va. at 725, 520 S.E.2d at 892. The potential connection we found in *Sipple* was of a different nature. There, the distributor did not receive any percentage of the gross sales of the store. The facts of the instant case show that Ms. Wurzburg received approximately 2 percent of the gross sales of the store by virtue of a "percentage clause" in her lease with Southland.

■ First, we note that the question of whether or not a joint venture exists is to be answered by the jury. "A plaintiff has a right to a jury trial upon the factual issues to determine whether a joint venture existed." *Lasry v. Lederman,* 147 Cal.App.2d 480, 305 P.2d 663 (1957); "Whether a relation of joint venture exists is primarily a question of fact for the trial court to determine from the facts and the inferences to be drawn therefrom." *Rhodes v. Sunshine Mining Co.,* 113 Idaho 162, 742 P.2d 417 (1987); *see also, Bahrs v. RMBR Wheels, Inc.,* 6 Neb.App. 354, 574 N.W.2d 524 (1998); *Johnco, Inc. v. Jameson Interests,* 741 So.2d 867 (La.App.1999).

We recognize that landlords and tenants commonly use a "percentage clause" to allow some flexibility in long term leases, and to distribute the impact of future inflation upon the parties (*i.e.*, a rise in price produces a rise in gross sales, which increases the amount owed the landlord, while the base rent remains the same). Thus we do not suggest that the mere existence of a "percentage clause" automatically creates a joint venture.

However, we also recognize that a percentage clause could be used to grant a landlord a substantial share in the tenant's business, suggesting a relationship beyond that of landlord and tenant. Thus we find that the use of a "percentage clause" in a commercial lease, whereby the landlord receives a percentage of sales or profits in addition to or in lieu of the base rent, may be viewed as evidence that a joint venture exists. Because we feel this raises a question of fact, summary judgment as to the issue of joint venture was inappropriate.

### IV.

### CONCLUSION

For the foregoing reasons, the grant of summary judgment as to Ms. Wurzburg was improper. This case is reversed and remanded for proceedings consistent with this opinion.

Reversed and remanded.

Justice SCOTT did not participate in the decision in this case.

Judge FRED RISOVICH, II, sitting by temporary assignment.

MAYNARD, Justice, dissenting:

I dissent because I do not believe that Ms. Wurzburg can be held liable for the gas leak of her lessee under any settled principle of law applicable to the facts of this case. It is clear to me that the circuit court properly granted summary judgment in favor of Ms. Wurzburg.

The proper resolution of this case is simple. As quoted by the majority in syllabus point 3, the Restatement (Second) of Torts § 379A (1965) states:

A lessor of land is subject to liability for physical harm to persons outside of the land caused by activities of the lessee or others on the land after the lessor transfers possession if, but only if, (a) the lessor at the time of the lease consented to such activity or knew that it would be carried on, and (b) the lessor knew or had reason to know that it would unavoidably involve such an unreasonable risk, or that special precautions necessary to safety would not be taken.

Here, Ms. Wurzburg agreed to the sale of gasoline by 7–11, so the first prong of the test is met. Concerning the second prong, however, there is no activity undertaken by the lessee which involves an unreasonable risk. As noted, but ignored, by the majority, our case of *Peneschi v. National Steel Corp.*, 170 W.Va. 511, 515, 295 S.E.2d 1, 5 (1982) states that while "the accumulation and use of combustible gas for a private purpose" is an abnormally dangerous undertaking, "[c]onditions and activities that are a 'natural' use of the land are not within the rule, such as ... gasoline in a filling station[.]" Plainly, this Court has stated that operating a gasoline station is not an abnormally dangerous activity that creates an unreasonable risk of harm. Accordingly, applying our law, Ms. Wurzburg is not liable as a lessor in this case.

However, this opinion creates new law out of thin air. In syllabus point 4, the majority opines that "the storage, sale, or distribution of gasoline is subject to the same analysis, as expressed in Restatement (Second) of Torts §§ 519 and 520 (1976), that we would apply to any other activity involving similar or greater danger to the public." I understand this to mean, when combined with the law articulated in syllabus point 3, that strict liability applies to the operation of every gasoline station in West Virginia, and that every lessor who leases his premises to a lessee who operates a gasoline station is now subject to liability for harm to persons caused by the gasoline. Hence, by the drafting of a single syllabus point, the majority has increased by ludicrous proportions the liability of those who operate gasoline stations and those who own the land upon which

these stations are located. This amounts to nothing more than an unwarranted modification and expansion of our law.

In addition, this holding defies common sense. There are thousands of gasoline stations in this State located everywhere from rural roadways to the downtown areas of our largest cities. We rarely hear, however, of a gasoline-related accident occurring at one of these stations. Also, it is simply not a common belief of those who live near gasoline stations or those who regularly use them that these stations pose a high degree of risk. Furthermore the storage, sale, and distribution of gasoline is absolutely essential to the life of our nation.

Finally, I fail to see the reason for the inclusion of syllabus point 4 in the opinion. The law governing nuisances is not applicable to the instant case where a single explosion caused damage to surrounding property. This is apples and oranges. There is simply no way to characterize the occurrence here as a nuisance.

In conclusion, I would have applied our law as written and concluded that Ms. Wurzburg is not liable for the accident at issue. Therefore, I would have affirmed the circuit court's grant of summary judgment on her behalf. Accordingly, I dissent.

DAVIS, Justice, dissenting:

(Filed April 12, 2000)

I dissent because the majority opinion obliterates existing standards for challenging a motion for summary judgment. By addressing the instant appeal on the merits, the majority has instructed the bar that it is no longer necessary for a plaintiff to respond in the circuit court to a defendant's motion for summary judgment. I will first review the procedural facts relevant to my dissent, and follow with a discussion of the applicable law.

On July 20, 1998, Gretchen L. Wurzburg (hereinafter "Ms. Wurzburg"), a defendant below, filed a motion for summary judgment. The record indicates that her motion was accompanied by a supporting memorandum and a sworn affidavit. Two exhibits were attached to the sworn affidavit, a copy of the lease between Wurzburg and the Southland Corporation (hereinafter "Southland") and a copy of a letter from Southland notifying Ms. Wurzburg of its plan to install and operate self-service gasoline equipment. The evidence accompanying Ms. Wurzburg's motion established, *inter alia,* that she was not aware of any dangerous or defective conditions on the property at the time she surrendered control of it to Southland and that she had not exercised any control over the leased premises during the term of the lease.[1]

There was nothing in the record before this Court in connection with the plaintiffs' appeal indicating that they responded in any way to Ms. Wurzburg's motion for summary judgment, or that they attempted to persuade the circuit court to apply the Restatement sections they advocated in their appeal to this Court.

On October 30, 1998, the circuit court entered summary judgment for Ms. Wurzburg. Thereafter, on November 17, 1998, the plaintiffs filed a "MOTION UNDER RULE 59(e) TO ALTER AND AMEND ORDER

---

1. In her memorandum supporting her motion for summary judgment, Ms. Wurzburg argued, generally, that the existing law regarding landlord liability was reflected in the following three syllabus points from *Cowan v. One Hour Valet, Inc.:*

[3.] The general rule is that a landlord or lessor is not liable for personal injury sustained on the leased premises, by reason of a defective condition thereof arising after the demise, by the tenant or those entering on the premises under the tenant's title.

[4.] Ordinarily, an invitee of a lessee or tenant stands in the same shoes as the tenant and the lessor is not liable for injuries suffered by an invitee of the tenant for defective condition of the premises, unless he would have been liable to the tenant.

. . . .

[7.] A landlord or lessor may be held liable to third parties where he has knowledge or should have known of a defective condition at the expiration of a lease and does not disclose or repair such condition before he renews the lease or rents the premises to a new tenant. 151 W.Va. 941, 157 S.E.2d 843 (1967). In its order granting summary judgment, the circuit court additionally recognized that "[i]n cases dealing with premises liability the Courts have generally held that 'the principle [] liability results either from control[] of the subject area or from a specific wrongful act.'" (quoting *Durm v. Heck's, Inc.,* 184 W.Va. 562, 565, 401 S.E.2d 908, 911 (1991)).

GRANTING SUMMARY JUDGEMENT FOR DEFENDANT WURZBURG." The plaintiffs' motion stated, in full:

Plaintiffs move the Court under the provisions of Rule 59(e), Rules of Civil Procedure, and [sic] accordance with the timely filing requirements of Rule 6(a), Rules of Civil Procedure, to alter and amend its order, entered October 30, 1998, granting defendant Gretchen Wurzburg's Motion for Summary Judgment.

1.  Plaintiffs assert that the Court made incomplete findings of fact thereby leading it to error.

2.  The Court completely misinterpreted, misapplied, and erroneously concluded the law governing landlord-lessor liability.

3.  The Court failed or refused to consider or rule on defendant Wurzburg's independent violations of the law as a basis for liability to plaintiffs.

On December 17, 1998, the circuit court denied the plaintiffs' motion and they subsequently appealed to this Court.

Heretofore, the law has been clear. To successfully respond to a motion for summary judgment, a plaintiff was required to meet his or her burden of establishing the existence of a genuine question of material fact by providing the circuit court with a memorandum presenting any legal arguments against summary judgment,[2] and/or evidence in the form of affidavits, depositions or answers to interrogatories. *See Powderidge Unit Owners Ass'n v. Highland Properties, Ltd.,* 196 W.Va. 692, 700, 474 S.E.2d 872, 880 (1996) ("[T]his Court[,] for obvious rea-

---

**2.** The plaintiffs' argument to this Court relied on the adoption of certain Restatement sections and questions of fact associated therewith.

**3.** Needless to say,

" ' "[a] motion for summary judgment should be granted only when it is clear that [there· is] no genuine issue of fact to be tried and inquiry concerning the facts is not desirable to clarify the application of the law." Syllabus Point 3, *Aetna Casualty & Surety Co. v. Federal Insurance Co. of New York,* 148 W.Va. 160, 133 S.E.2d 770 (1963).' Syllabus Point 1, *Andrick v. Town of Buckhannon,* 187 W.Va. 706, 421 S.E.2d 247 (1992)." Syl. Pt. 1, *Williams v. Precision Coil, Inc.,* 194 W.Va. 52, 459 S.E.2d 329 (1995).

sons, will not consider *evidence or arguments* that were not presented to the circuit court for its consideration in ruling on the motion [for summary judgment]." (emphasis added)).

In this regard, Rule 56(e) of the West Virginia Rules of Civil Procedure specifically directs:

When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party.

In addition, this Court has explained the circumstances under which summary judgment is appropriate and the associated burden on a party resisting summary judgment:[3]

Summary judgment is appropriate if, from the totality of the evidence presented, the record could not lead a rational trier of fact to find for the nonmoving party, such as where the nonmoving party has failed to make a sufficient showing on an essential element of the case that it has the burden to prove.

Syl. pt. 2, *Williams v. Precision Coil, Inc.,* 194 W.Va. 52, 459 S.E.2d 329 (1995). Further describing the non-moving party's burden, we have held:

Syl. pt. 1, *Tolliver v. Kroger Co.,* 201 W.Va. 509, 498 S.E.2d 702 (1997). In defining the concept of a genuine issue of fact, we have explained:
"Roughly stated, a [']genuine issue['] for purposes of West Virginia Rule of Civil Procedure 56(c) is simply one half of a trialworthy issue, and a genuine issue does not arise unless there is sufficient evidence favoring the non-moving party for a reasonable jury to return a verdict for that party. *The opposing half of a trialworthy issue is present where the non-moving party can point to one or more disputed [']material[']  facts.* A material fact is one that has the capacity to sway the outcome of the litigation under the applicable law." Syl. Pt. 5, *Jividen v. Law,* 194 W.Va. 705, 461 S.E.2d 451 (1995). Syl. pt. 2, *Tolliver,* 201 W.Va. 509, 498 S.E.2d 702 (emphasis added).

If the moving party makes a properly supported motion for summary judgment and can show by affirmative evidence that there is no genuine issue of a material fact, the burden of production shifts to the non-moving party who must either (1) rehabilitate the evidence attacked by the moving party, (2) produce additional evidence showing the existence of a genuine issue for trial, or (3) submit an affidavit explaining why further discovery is necessary as provided in Rule 56(f) of the West Virginia Rules of Civil Procedure.

Syl. pt. 3, *id.* We have also elaborated on this standard by clarifying that, "in relation to (1) and (2) above, the non-moving party must, *at a minimum,* offer more than a 'scintilla of evidence' to support his or her claim." *Jividen v. Law,* 194 W.Va. 705, 713, 461 S.E.2d 451, 459 (1995) (emphasis added) (citing *Williams,* 194 W.Va. 52, 459 S.E.2d 329). *See also Painter v. Peavy,* 192 W.Va. 189, 192–93, 451 S.E.2d 755, 758–59 (1994) ("[T]he party opposing summary judgment must satisfy the burden of proof by offering more than a mere 'scintilla of evidence,' and must produce evidence sufficient for a reasonable jury to find in a nonmoving party's favor." (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 252, 106 S.Ct. 2505, 2512, 91 L.Ed.2d 202, 214 (1986))). Indeed,

[t]o meet this burden, the nonmovant must identify specific facts in the record and articulate the precise manner in which that evidence supports its claims. As to material facts on which the nonmovant will bear the burden at trial, the nonmovant must come forward with evidence which will be sufficient to enable it to survive a motion for directed verdict at trial. If the non-moving party fails to meet this burden, the motion for summary judgment *must* be granted. *See Nebraska v. Wyoming,* 507 U.S. 584, 590, 113 S.Ct. 1689, 1694, 123 L.Ed.2d 317, 328 (1993); *Lujan v. National Wildlife Federation,* 497 U.S. 871, 884,

110 S.Ct. 3177, 3186, 111 L.Ed.2d 695, 713 (1990).

*Powderidge Unit Owners Ass'n v. Highland Properties, Ltd.,* 196 W.Va. at 699, 474 S.E.2d at 879.

In *Powderidge,* this Court additionally commented that:

Rule 56 does not impose upon the circuit court a duty to sift through the record in search of evidence to support a party's opposition to summary judgment. Nor is it our duty to do so on appeal. *Because the plaintiff filed no fact-specific affidavit, it did not meet its burden to designate specific facts showing a genuine issue for trial.*

196 W.Va. at 700, 474 S.E.2d at 880 (emphasis added). The *Powderidge* Court declined to consider an affidavit that was subsequently tendered to this Court in connection with the plaintiff's appeal of the summary judgment order because that affidavit had not been presented to the circuit court. In so ruling, the Court stated:

Although our review of the record from a summary judgment proceeding is *de novo,* this Court[,] for obvious reasons, will not consider *evidence or arguments* that were not presented to the circuit court for its consideration in ruling on the motion. To be clear, our review is limited to the record as it stood before the circuit court at the time of its ruling.

*Powderidge,* 196 W.Va. at 700, 474 S.E.2d at 880 (second emphasis added).

Even though our review of a circuit court's decision on summary judgment is *de novo,*[4] it is, nevertheless, a *review.* Our task is to consider the evidence that was before the circuit court to determine whether summary judgment was appropriate. As indicated above, we have repeatedly admonished that nonjurisdictional issues not raised before the trial court will not be addressed on appeal.[5]

---

4. *See* Syl. pt. 1, *Painter v. Peavy,* 192 W.Va. 189, 451 S.E.2d 755 (1994).

5. *See, e.g., State ex rel. Clark v. Blue Cross Blue Shield of West Virginia, Inc.,* 203 W.Va. 690, 699, 510 S.E.2d 764, 773 (1998) ("Typically, we have steadfastly held to the rule that we will not address a nonjurisdictional issue that has not

been determined by the lower court."); *Tiernan v. Charleston Area Med. Ctr., Inc.,* 203 W.Va. 135, 150 n. 27, 506 S.E.2d 578, 593 n. 27 (1998) (" 'This Court will not pass on a nonjurisdictional question which has not been decided by the trial court in the first instance.' " (citation omitted)); *Hartwell v. Marquez,* 201 W.Va. 433, 442, 498 S.E.2d 1, 10 (1997) (" 'It is a well established

42

In the present case, I believe Ms. Wurzburg met her initial burden of demonstrating that there was no question of fact as to her liability regarding the gasoline storage tanks. She met her burden through her memorandum offering legal support for her motion for summary judgment and its accompanying sworn affidavit with attached exhibits. Thus, the burden then shifted to the plaintiffs to offer more than a scintilla of evidence to establish the existence of a genuine issue of material fact. The record on appeal contains absolutely no evidence demonstrating that the plaintiffs met this burden. In fact, the record indicates that the plaintiffs failed to respond at all to Ms. Wurzburg's motion for summary judgment prior to the circuit court's ruling. Only after the circuit court granted summary judgment for Ms. Wurzburg did the plaintiffs respond with their motion to alter and amend the circuit court's

order. Assuming, without deciding, that it was proper for the plaintiffs to raise their arguments at this late stage, they nevertheless utterly failed to produce any evidence or advance any specific legal argument establishing the existence of a justiciable issue of fact.

The plaintiffs' meager motion in no way preserved the arguments they asserted on appeal. By considering the plaintiffs' newly made arguments, the majority has ignored the specific mandates of Rule 56(e) as well as a long history of precedent set forth by this Court, as well as the Supreme Court of the United States.[6] By doing so, the majority has instructed the bar that it is not necessary to respond in the circuit court to a motion for summary judgment. Rather, a party may silently wait for the circuit court's ruling, and, if the ruling is unfavorable, he or she

principle that this Court will not decide nonjurisdictional questions which have not been raised in the court below.' " (citations omitted)); Syl. pt. 2, *Trent v. Cook*, 198 W.Va. 601, 607, 482 S.E.2d 218, 224 (1996) (" '[T]he Supreme Court of Appeals is limited in its authority to resolve assignments of nonjurisdictional errors to a consideration of those matters passed upon by the court below and fairly arising upon the portions of the record designated for appellate review.' " (citations omitted)); Syl. pt. 3, *Voelker v. Frederick Bus. Properties Co.*, 195 W.Va. 246, 465 S.E.2d 246 (1995) (" ' "In the exercise of its appellate jurisdiction, this Court will not decide nonjurisdictional questions which were not considered and decided by the court from which the appeal has been taken." ' " (citations omitted)); Syl. pt. 3, *Hall's Park Motel, Inc. v. Rover Constr., Inc.*, 194 W.Va. 309, 460 S.E.2d 444 (1995) (" 'In the exercise of its appellate jurisdiction, this Court will not decide nonjurisdictional questions which have not been decided by the court from which the case has been appealed.' " (citation omitted)); Syl. pt. 4, *State ex rel. State Line Sparkler of WV, Ltd. v. Teach*, 187 W.Va. 271, 418 S.E.2d 585 (1992) (" ' "This Court will not pass on a nonjurisdictional question which has not been decided by the trial court in the first instance." ' " (citations omitted)); Syl. pt. 8, *Charlton v. Charlton*, 186 W.Va. 670, 413 S.E.2d 911 (1991) (same); Syl. pt. 2, *Crain v. Lightner*, 178 W.Va. 765, 364 S.E.2d 778 (1987) (same); Syl. pt. 2, *Duquesne Light Co. v. State Tax Dep't*, 174 W.Va. 506, 327 S.E.2d 683 (1984) (same); Syl. pt. 5, *Randolph v. Koury Corp.*, 173 W.Va. 96, 312 S.E.2d 759 (1984) (same); Syl. pt. 3, *Wells v. Roberts*, 167 W.Va. 580, 280 S.E.2d 266 (1981) ("As a general rule '[t]his Court will not consider questions, nonjurisdictional in their nature, which have not been acted upon by the trial court.' Syl. pt. 1,

*Buffalo Mining Co. v. Martin*, 165 W.Va. 10, 267 S.E.2d 721 (1980)."); Syl. pt. 1, *Shackleford v. Catlett*, 161 W.Va. 568, 244 S.E.2d 327 (1978) (same); Syl. pt. 1, *Adams v. Bowens*, 159 W.Va. 882, 230 S.E.2d 481 (1976) (same); Syl. pt. 2, *Young v. Young*, 158 W.Va. 521, 212 S.E.2d 310 (1975) ("In the exercise of its appellate jurisdiction, this Court cannot consider nonjurisdictional errors not raised and decided by the trial court."); Syl. pt. 6, in part, *Parker v. Knowlton Constr. Co., Inc.*, 158 W.Va. 314, 210 S.E.2d 918 (1975) (same); Syl. pt. 1, *Boury v. Hamm*, 156 W.Va. 44, 190 S.E.2d 13 (1972) (same); Syl. pt. 1, *Bank of Wheeling v. Morris Plan Bank & Trust Co.*, 155 W.Va. 245, 183 S.E.2d 692 (1971) (same); Syl. pt. 1, *Mowery v. Hitt*, 155 W.Va. 103, 181 S.E.2d 334 (1971) (same); Syl. pt. 4, *In re Morgan Hotel Corp.*, 151 W.Va. 357, 151 S.E.2d 676 (1966) (same); Syl. pt. 10, in part, *Aetna Cas. & Sur. Co. v. Federal Ins. Co. of New York*, 148 W.Va. 160, 133 S.E.2d 770 (1963) ("[I]n cases within [this Court's] appellate jurisdiction it will not consider or decide nonjurisdictional questions which have not been determined by the trial court."); Syl. pt. 2, *Sands v. Security Trust Co.*, 143 W.Va. 522, 102 S.E.2d 733 (1958) (same); Syl. pt. 1, *Vecellio v. Bopst*, 121 W.Va. 562, 6 S.E.2d 708 (1939) ("This Court need not pass on questions not raised in the trial court the action of which is being reviewed."); Syl. pt. 3, *Nuzum v. Nuzum*, 77 W.Va. 202, 87 S.E. 463 (1915) ("The [S]upreme [C]ourt will not consider questions not yet acted upon by the circuit court in the case."); Syl. pt. 7, *Kesler v. Lapham*, 46 W.Va. 293, 33 S.E. 289 (1899) (same).

6. We often look to federal law in interpreting our rules of civil procedure, because our rules are nearly identical to the Federal Rules of Civil Procedure.

may then come to this Court to present evidence against summary judgment. Thus, the majority's action, in addition to ignoring existing law, deprives this Court of its appellate role, and further abrogates the circuit court's role as the court of first impression. Therefore, I must respectfully dissent.